## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

FIRST AMERICAN BANK                           CIVIL ACTION

versus                                        No. 06-10961

FIRST AMERICAN TRANSPORTATION                 SECTION: I/1
TITLE INSURANCE COMPANY


<u>ORDER AND REASONS</u>

Before the Court is a motion for partial summary judgment filed on behalf of defendant, First American Transportation Title Insurance Company ("FATTIC").  For the reasons set forth below, FATTIC's motion for partial summary judgment is **GRANTED**.

### *Background*

In 2004, the plaintiff, First American Bank ("First American") provided Titan Cruise Lines, Inc., ("Titan") with a $28,000,000 loan to support Titan's operation of a gaming vessel known as the Ocean Jewel.[1]  As collateral for this loan, Titan executed ship mortgages (the "ship mortgages") in favor of First American on the Ocean Jewel, and on the Emerald Express (the "Emerald") and the Sapphire Express (the "Sapphire"), two high speed catamarans used to shuttle customers back and forth from land to the Ocean Jewel.[2]

On or about October 12, 2004, FATTIC issued two separate title insurance policies (the "policies") to First American in order to secure First American's interest in the ship mortgages.  FATTIC first issued Eagle Protection Vessel Loan Policy No. FT-VSL-00773,

---

[1] Rec. Doc. No. 43, p. 3.

[2] Rec. Doc. No. 1, p. 2, par. 5.  These ship mortgages were executed on or about October 12, 2004.  First American's complaint alleges that FATTIC breached its contractual duty only with respect to the Emerald and the Sapphire.  *Id.* at para. 6.

which secured First American's interest in the ship mortgages placed on the Ocean Jewel.  FATTIC then issued Eagle Protection Vessel Loan Policy No. FT-VSL-00778, which secured First American's interest in the ship mortgage placed on the Emerald and on the Sapphire.  The policies cross-referenced each other and provided a single aggregate coverage limit of $28,000,000, the value of First American's loan to Titan.

On or about August 1, 2005, Titan filed bankruptcy proceedings in the Tampa Division of the United States District Court for the Middle District of Florida.[3]  At the time the proceedings were filed, the Ocean Jewel, the Emerald, and the Sapphire (collectively, the "vessels") were encumbered by necessaries liens resulting from debts owed to suppliers of necessaries for the vessels.

On January 11, 2006, the bankruptcy court approved the sale of the Ocean Jewel, which garnered $5,556,331.00 to be placed in a fund established for secured creditors (the "fund").  Of the $5,556,331.00 deposited in the fund, $1,162,287.02 was disbursed to pay the necessaries liens encumbering the Ocean Jewel.  An additional $156,140.00 of the proceeds deposited in the fund was reserved for the payment of two unresolved claims.  The residual of the $5,556,331.00 placed in the fund, $4,187,823.15, was disbursed

---

[3]Rec. Doc. No. 34-2, p. 5. See also Exhibit 6 attached to FATTIC's Motion for Partial Summary Judgment.

to First American.  First American also received a payment from FATTIC in the amount of $1,162,287.02, which compensated First American for the amount of funds issued to satisfy the necessaries liens placed on the Ocean Jewel.

Originally, the Sapphire was to be sold at auction with the Ocean Jewel.  The Sapphire was deleted from the sale, however, after the vessel took on water and sank at her moorings. Subsequent to the Sapphire sinking, the bankruptcy court ordered that  the costs incurred by Tampa Bay Shipbuilding and Repair Company ("TBSR") in keeping and maintaining the Sapphire were "super-priority" claims superior to any maritime lien on the vessel.  Additionally, the bankruptcy court ordered that Titan's abandonment of the Sapphire be approved.

Subsequent to the bankruptcy court's orders establishing the superiority of TBSR's claims and approving Titan's abandonment of the Sapphire, TBSR filed an *in rem* action against the Sapphire in the United States District Court for the Middle District of Florida.  As a result of these proceedings, the Sapphire was seized by U.S. Marshals and sold to TBSR at public auction for the value of TBSR's liens.

Similarly, Eastern Shipbuilding Group, Inc., ("Eastern") filed an *in rem* action against the Emerald seeking recovery for liens encumbering the Emerald in favor of Eastern.  The result of this action mirrored that of TBSR's *in rem* action against the Sapphire.

-3-

The Emerald was seized by U.S. Marshals and sold to Eastern at public auction for a portion of the value of Eastern's liens.

First American alleges that the seizures and sales executed to satisfy the necessaries liens encumbering the Sapphire and the Emerald left no value to satisfy First American's ship mortgages. As a result, First American further alleges that it presented FATTIC with a claim under the policy insuring the mortgage encumbering the Sapphire and the Emerald.[4]  According to First American, FATTIC denied any liability to First American under the policy.[5]

Subsequent to FATTIC's alleged denial of liability, First American filed the present lawsuit.[6]  In its complaint, First American asserted the following claims: (1) FATTIC is obligated to pay First American for "*all* losses suffered by [First American] as a result of the *existence* of the Necessaries Liens;" (2) FATTIC's failure to honor First American's claim constituted a breach of FATTIC's obligations under the policy, rendering FATTIC liable for all amounts expended by First American in defending claims against the vessels; and (3) FATTIC breached its duty of good faith and fair dealing and it is, therefore, required to pay penalties in the

---

[4]Rec. Doc. No. 1, p. 4, para. 12.

[5]*Id.* at para. 13.  In its memorandum in support of the motion, FATTIC acknowledges that it must pay to First American all amounts that the holders of the necessaries liens recovered or will recover.  Rec. Doc. No. 34-2, p. 12.

[6]Rec. Doc. No. 1.

amount of two times the damages suffered by First American.[7]

On August 7, 2007, FATTIC filed a motion for partial summary judgment requesting that the Court issue a declaratory judgment holding that the measure of indemnity under First American's insurance policy is the amount, if any, by which First American's loss of priority to the necessaries liens has reduced First American's recovery on its loans.[8]  Specifically, FATTIC seeks a declaration that the measure of recovery is limited under Section 7(a)(iii) of the policy to the amount by which the recovery on First American's mortgages was reduced by payments to the holders of the priming liens for necessaries.[9]  An additional issue to be addressed in this motion is whether First American may recover consequential damages under FATTIC's policies.

### The Policies

The primary insuring clause of the policies provides that FATTIC shall be liable for "*actual* loss or damage . . . sustained or incurred by [First American] by reason of . . . " any of nineteen specifically enumerated risks.[10]  Based on First American's complaint, the most pertinent "covered risks" include: (1) the unmarketability of the title of the insured mortgage; (2) the

---

[7]*Id.* at pp. 4-5.

[8]Rec. Doc. No. 34.

[9]Rec. Doc. No. 34-2, p. 2.

[10]Rec. Doc. No. 34-5, p. 2, Rec. Doc. No. 34-6, p. 2.

failure of the insured mortgage to have the equivalent priority of a preferred mortgage as defined in 46 U.S.C. § 31322; and (3) the lack of priority of the insured mortgage over any statutory lien for necessaries (as that term is defined in 46 U.S.C. § 31301 or its equivalent under the law of Panama) provided to the vessel prior to or after the date of the policy, whether or not the statutory lien for necessaries arises prior to or after the date of the policy.[11]

In the event that an insured, in this case First American, files a "valid claim," FATTIC's policies provide several alternatives as to the manner in which FATTIC may fulfill its obligations. Following written request by the insured and subject to the options stated in Section 6 of the policies, Section 4 of FATTIC's policies, titled "DEFENSE AND PROSECUTION OF ACTION; DUTY OF INSURED CLAIMANT TO COOPERATE," authorizes FATTIC to defend First American's ship mortgages against priming liens for necessaries.[12] Section 6 of FATTIC's policies, titled "OPTIONS TO

---

[11]The risks at issue are part of the insurance policy. Only risk number three (3), i.e., unmarketability of title, is contained on the cover page. The other specifically referenced risks are contained in Endorsement No. 1 attached to the policies. The endorsements are subject to all of the terms and provisions of the policies and of any prior endorsements. See also Rec. Doc. No. 1, pp. 2-3, para. 7.

[12]Section 4: "DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE" - (a) Upon written request by the Insured and subject to the options contained in Section 6 below, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim adverse to the Title or the lien of the Insured Preferred Mortgage, as insured, but only as to those stated causes of action alleging a defect, lien, or encumbrance or other matter insured against by this policy. The Company shall have the right to select legal counsel of its choice (subject to the right of the Insured to object for reasonable cause) to

PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY," primarily allows FATTIC to tender payment of the amount of the insurance remaining or available under the policy, purchase the indebtedness secured by the Insured Preferred Mortgage, pay or settle claims with parties other than the insured, or pay or settle claims with First American.[13]

---

represent the Insured as to those stated causes of action and shall not be liable for and will not pay the fees, costs or expenses incurred by the Insured in the defense of those causes of action which allege matter not insured;

    (b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Preferred Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action ... (illegible portion of policy). If the Company shall exercise its rights under this paragraph, it shall do so diligently;

    (c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order;

    (d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the Insured shall secure the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals related thereto, and permit the Company to use, as its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the Title or the lien of the Insured Preferred Mortgage, as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

    [13]Section 6: "OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY" - In case of a claim under this policy, the Company shall have the options set forth in paragraphs 6(a) and (b) below:

    (a) Payment or Tender of Payment of the Amount of Insurance or Purchase of the Indebtedness.

        (I) To pay or tender payment of the amount of insurance then remaining available under this policy together with any costs, attorney's fees and expenses incurred by the Insured Claimant which were authorized by the Company up to the time of payment or tender of payment and which the Company is obligated to pay; or

In the event that an insured proves that it has sustained a covered loss, Section 7 of FATTIC's policies determines the extent of FATTIC's liability.  Section 7, titled "DETERMINATION AND EXTENT OF LIABILITY," provides that:

> This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.
>    (a) The liability of the Company under this policy shall not exceed the least of:
>       (I) The Amount of Insurance stated in Schedule A, or, if applicable, the amount of the insurance as defined in Section 2© of these Conditions; or
>       (ii)  The amount of the unpaid principal indebtedness secured by the Insured Preferred Mortgage together with the amounts provided

---

        (ii) To purchase the indebtedness secured by the Insured Preferred Mortgage for the amount owing thereon together with any costs, attorney's fees and expenses incurred by the Insured Claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay. If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign and convey the indebtedness and the Insured Mortgage, together with any other collateral security, to the Company upon payment therefor.
    Upon the exercise by the Company of either of the options provided for in (a)(I) or (ii), all liability and obligations to the Insured under this policy, other than to make the payment required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation, and the policy shall be surrendered to the Company for cancellation.
    (b) Payment or Settlement with Parties Other Than the Insured or With the Insured Claimant.
        (I) To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy, together with any costs, attorney's fees and expenses incurred by the Insured Claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or
        (ii) To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorney's fees and expenses incurred by the Insured Claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.
    Upon the exercise by the Company of either of the options provided for in (b)(I) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than to make the payment required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

for under Section 8(d) of these Conditions or as reduced under Section 9 of these Conditions, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) The difference between the value of the Title as insured and the value of the Title subject to the defect, lien, or encumbrance insured against by this policy; provided, however, that this Section 7(a)(iii) shall not apply when the defect, lien, encumbrance or other matter insured against by this policy results in a total failure of the lien of the Insured Preferred Mortgage to attach to the Title;

(b) In the event the Insured has acquired the Title in the manner described in Section 2(a) of these Conditions or has conveyed the Title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions;

©) The Company will pay only those costs, attorney's fees and expenses incurred in accordance with Section 4 of these Conditions.

### *Law and Analysis*

**I. Rule 56 Standard**

A party seeking a declaratory judgment is entitled to summary judgment when, after reviewing the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," the court determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 266

-9-

(1986).   The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Id.; Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986) (internal quotation omitted).

Once the party seeking the summary judgment carries its burden pursuant to Rule 56©), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). The showing of a genuine issue is not satisfied by creating some metaphysical doubt as to the material facts by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).   Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).   The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue.  *Id.*  The non-moving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S. Ct. 1545, 1551-52, 143 L. Ed.

-10-

2d 731 (1999) (internal quotation and citation omitted).

## II. *Insurance Policy Interpretation Generally*

Under Louisiana law, "the interpretation of an insurance policy usually involves a legal question which can be resolved in the framework of a motion for summary judgment." *Bonin v. Westport Ins. Corp.*, 930 So.2d 906, 910 (La. 2006).  Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code. *Id; see also Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 516 (5th Cir. 2005).[14]  Just as with contracts, the judiciary's role in interpreting insurance policies is to ascertain the common intent of the parties. *Coleman*, 418 F.3d at 516; *Bonin*, 930 So.2d at 910; *see also* La. Civ. Code Ann. 2045.

The words used in an insurance policy must be given their generally prevailing meaning. *Coleman*, 418 F.3d at 516; *Bonin*, 930 So.2d at 910; *see* La. Civ. Code Ann. 2047.  Where these words are clear and explicit and lead to no absurd consequences, the policy's meaning and the parties' intent *must be sought within the four corners of the document* and cannot be explained *or* contradicted by

---

[14]See La. Civ. Code Anns. 2045-2057.  Title insurance policies are subject to the *same rules of construction* that apply to other types of insurance policies.  *Falmouth Nat'l Bank v. Ticor Title Ins.*, 920 F.2d 1058, 1061 (1st Cir. 1990).  The overall goal when interpreting an insurance policy is to ascertain the expectations of the parties.  *Id.*  As with any insurance policy, the *policy language itself* defines the risks transferred to the insurance company.  *Haw River Land & Timber Co. v. Lawyers Title Ins. Corp.*, 152 F.3d 275, 278 (4th Cir. 1998).

extrinsic evidence.  *In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 440 (5th Cir. 2002); *Coleman*, 418 F.3d at 518 (When the language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation). Each provision of an insurance policy "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Coleman*, 418 F.3d at 516; La. Civ. C. Art. 2050.

Insurance policies should not be interpreted "in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Bonin*, 930 So.2d at 910; *Coleman*, 418 F.3d at 516.  Should ambiguities remain in an insurance policy after applying the general rules of contract interpretation, they are to be strictly construed against the insurer and in favor of coverage. La. Civ. C. Art. 2056.  However, an insurance policy is ambiguous only when it is susceptible of two or more interpretations and each of the alternative interpretations is reasonable. *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).  An ambiguity is not created simply because one of the parties to an insurance policy can create a dispute in hindsight.  *Id.*

## III.  *Interpretation of FATTIC's Policies*

### A. *Measure of Indemnity/Extent of Liability*

As stated previously, FATTIC asks the Court to declare that the measure of recovery under FATTIC's policies is limited by Section 7(a)(iii) to the amount by which the recovery on First American's mortgages was reduced by payments to the holders of priming liens for necessaries.  After applying general rules of contract interpretation, the Court concludes that the plain language of Section 7(a)(iii) limits FATTIC's liability to the amount by which the necessaries liens reduced First American's recovery on its ship mortgages.

Section 7 of FATTIC's policies provides that, in the event of an actual monetary loss or damage sustained by reason of a risk covered under the policies, FATTIC's liability will be limited by one of three alternative measures of liability contained in Section 7(a).[15]  Section 7(a) states that the measure to be applied to determine the extent of FATTIC's liability for the loss or damage is the one that will cause FATTIC to incur the least amount of liability.[16]  Both FATTIC and First American state in each of their the memorandum that the measure of loss that will cause FATTIC to incur the least amount of liability in the present matter is Section 7(a)(iii).[17]

---

[15]See Eagle Protection Vessel Loan Policy No. 00778 Section 7.

[16]See Eagle Protection Vessel Loan Policy No. 00778 Section 7(a).

[17]First American states in its memorandum in opposition to the motion that First American's measure of recovery under subsection 7(a)(i) and 7(a)(ii) would exceed that under 7(a)(iii); therefore, First American measured its losses in accordance with 7(a)(iii).  See Rec. Doc. No. 43, p. 10.  FATTIC states in its

-13-

The Court finds that the language in Section 7(a)(iii) clearly and explicitly provides the extent to which FATTIC will be liable for losses covered under the policy.  Section 7(a)(iii) states in pertinent part that the extent of FATTIC's liability under its policies will be "[t]he difference between the value of the Title as insured and the value of the Title subject to the defect, lien or encumbrance insured against by this policy."  The Court interprets this language to mean that FATTIC's liability is limited to the difference between the value of First American's ship mortgages when unencumbered and the value of First American's ship mortgages subject to the necessaries liens.[18]  Put another way, the extent of FATTIC's liability is the amount by which the necessaries liens have reduced the value of First American's ship mortgages.[19]

_____

supplemental memorandum in support of the motion that the proper measure of liability in the present matter is Section 7(a)(iii).  *See* Rec. Doc. No. 53, p. 11.

[18]Even though First American does not expressly acknowledge that Section 7(a)(iii) is the proper measure of the extent of FATTIC's liability under the policies, First American states that its accounting expert, George J. Panzeca, employed the value differential contained in Section 7(a)(iii) when calculating the losses for which First American could recover under the policies. Rec. Doc. No. 43, p. 10.  First American does not appear to dispute that the proper calculation/measure for determining its recovery is contained in Section 7(a)(iii).

[19]The Court notes that the first endorsement attached to FATTIC's policy substitutes paragraph fourteen (14) of the "Covered Risks" with a provision stating, in pertinent part, that FATTIC insures against actual loss or damage sustained by reason of "Lack of priority of the Mortgage insured hereunder over any statutory lien for Necessaries... provided to the Vessels prior to or after the Date of the Policy whether or not the statutory lien for Necessaries arises prior to or after the Date of the Policy."  Logically, in the context of security devices such as First American's ship mortgages, the loss to be suffered as a result of "lack of priority" is a reduction in the amount recoverable under that device.  *Falmouth*, 920 F.2d at 1063 ("[Under a title insurance policy], it is not the mortgage note that is insured, but rather, what is insured is the loss resulting from a defect in the security").

-14-

## B. *First American's Consequential Damages*

First American argues in its memorandum in opposition that the main coverage provision of FATTIC's policies providing coverage for "actual loss or damage" is broad and supports a liberal reading of the coverage.  First American contends that, given the broad nature of the main insuring provision, FATTIC insured against both actual and consequential damages and, if FATTIC intended to exclude consequential damages, FATTIC could have done so by including a statement to that effect in the exclusion section of the policies.

Applying general rules of contract interpretation to FATTIC's insurance policies, the Court finds that the plain language contained in the policies limits First American's indemnity to *only those* "*actual damages*"[20] sustained by reason of one or more of the nineteen (19) specifically enumerated risks.

FATTIC's policies clearly and explicitly state in the primary coverage provisions that FATTIC insured "actual loss or damage" resulting from the specifically covered risks.  The Court interprets this language to  mean that the parties intended to insure only against "actual damages" sustained by reason of the occurrence of a specifically covered risk, and not against those

---

[20]In *Perrone v. General Motors Acceptance Corp.*, the Fifth Circuit referenced Black's Law Dictionary when defining "actual damages." 232 F.3d 433, 435-36 (5th Cir. 2000).  Black's defines "actual damages" as amounts awarded to a complainant to compensate for a proven/actual injury or loss.  *Id.*  Black's defines "consequential damages" as "[l]osses that do not flow directly and immediately from an injurious act, but that result indirectly from the act."

damages that may be a peripheral result of such an occurrence, i.e., consequential damages.[21]

The Court's interpretation is bolstered by the fact that section 7 of FATTIC's policies reiterates that the parties are entering into a "contract of indemnity against *actual monetary loss or damage* sustained or incurred... by reason of matters insured against by the polic[ies]." *See Falmouth*, 920 F.2d at 1062-63 ("[A] distinguishing characteristic of a contract to indemnify is that the loss must be actual; the mere existence of a defect covered by the policy in and of itself is not sufficient to justify recovery"). Considering the fact that there is no other *reasonable* interpretation of the coverage provisions contained in FATTIC's policies, the Court finds that the provisions are unambiguous. As such, the Court is prohibited by law from conducting any further inquiry as to the parties' intent. *Liljeberg*, 304 F.3d at 440; La. Civ. C. Art. 2046.

In addition to finding that the language in FATTIC's policies is clear and explicit, the Court finds that the enforcement of

---

[21]FATTIC's policies specifically state, more than once, that the policies insure only against "actual" monetary losses or damage. Nowhere in FATTIC's policies is there any mention of "consequential damages." As such, the only reasonable interpretation of the policies at issue is that they were not intended to insure against consequential damages, but rather only against "actual damages." While the Court understands the utility of an insurer specifically excluding the types of damages it does not intend to cover, the Court does not find such exclusions are absolutely necessary where, as in the present case, the insurer has specifically stated the types of damages it does intend to cover. The reasonable interpretation of such provisions is that the insurer intends to limit its coverage to only those types of damages specifically listed. *See*

-16-

FATTIC's policies, as written, would not lead to an absurd consequence.  The policies clearly indicate that, in the event First American suffers an "actual loss" as a result of a covered risk, FATTIC is liable to First American for the value of the actual loss suffered.  Conditioning the recovery of actual monetary losses or damages upon the occurrence of a specifically covered risk does not lead to an absurd result.  While the determination of which losses are encompassed within the term "actual damages" is a matter to be determined at a later time, the term itself clearly provides a specific remedy to First American, and the remedy does not include "consequential damages."

First American further asserts in its memorandum in opposition that an interpretation limiting FATTIC's liability to only actual damages would permit FATTIC, in certain circumstances, to completely terminate its liability under the policies by minimizing the amount of the proceeds received as a result of the enforcement of a priming lien for necessaries.  Such conduct, if it has in fact occurred, would affect the determination of whether FATTIC has breached its duties of good faith and fair dealing imposed by La. R.S. § 22:1220(A).[22]  The Court does not find it necessary to make such a determination, as FATTIC's compliance with its contractual

---

[22]"An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing.  The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for *any* damages sustained as a result of the breach."  La. R.S. § 22:1220(A).

obligation in that respect is not an issue before the Court in the present motion.

Considering the foregoing,

**IT IS ORDERED** that the motion for partial summary judgment seeking declaratory judgment, filed by First American Transportation Title Insurance Company, is **GRANTED** as the Court finds that FATTIC's insurance policies limit First American's recovery to the amount by which First American's recovery on its mortgages was reduced by payments to the holders of the priming liens for necessaries.[23]   The Court also finds that FATTIC's policies insure only against those actual damages sustained by reason of a specifically covered risk.[24]


New Orleans, Louisiana, September <u>   19th   </u>, 2007.


LANCE M. AFRICK
**UNITED STATES DISTRICT JUDGE**

---

[23]Rec. Doc. No. 34-2, p. 2.

[24]Rec. Doc. No. 34-2, p. 2.   As stated previously, the determination of what constitutes "actual damage" is left to be determined at a later time.