## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**FIRST AMERICAN BANK,**　　　　　　　　　　**CIVIL ACTION**
　　**Plaintiff**

**VERSUS**　　　　　　　　　　　　　　　　**No. 06-10961**
　　　　　　　　　　　　　　　　　　　　　　**c/w 08-1682**

**FIRST AMERICAN TRANSPORTATION**　　　**SECTION "E"**
**TITLE INSURANCE CO.,**
　　**Defendant**

**APPLIES TO: ALL CASES**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above-captioned matters, which were consolidated for purposes of discovery and trial,[1] were tried before the Court, sitting without a jury, from October 22, 2012 to October 24, 2012.[2] After trial, the Court ordered the parties to submit post-trial briefs, all of which have been submitted.[3] Having considered the testimony and evidence at trial, the pre- and post-trial briefs submitted by the parties, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

---

[1] *See* R. Doc. 73 in Civil Action No. 06-10961. Unless specifically noted otherwise, all record citations in this Findings of Fact and Conclusions of Law refer to the docket sheet in Civil Action No. 06-10961.

[2] R. Doc. 148 (Minute entry from first day of bench trial); R. Doc. 149 (Minute entry from second day of bench trial); R. Doc. 150 (Minute entry from third and final day of bench trial).

[3] *See* R. Doc. 154 (First American Bank's post-trial memorandum); R. Doc. 157 (First American Transportation Title Insurance Company's post-trial memorandum); R. Doc. 160 (First American Bank's response to First American Transportation Title Insurance Company's post-trial memorandum).

# FINDINGS OF FACT[4]

## I.     Titan's Ill-Fated Offshore Gaming Venture

1.     During 2004, plaintiff First American Bank (the "Bank")[5] was approached by Titan Cruise Lines, Inc. ("Titan") for financing for an offshore gaming venture Titan was planning.  At the time it approached the Bank, Titan had recently purchased a former Russian car ferry called the Ocean Jewel, on which Titan planned to spend millions of dollars to refurbish and turn into an offshore casino to be anchored in international waters off the coast of St. Petersburg, Florida.  Titan also had purchased two high speed catamarans, the Sapphire Express and the Emerald Express (collectively, the "Shuttles") to shuttle customers back and forth between St. Petersburg and the Ocean Jewel.[6]

2.     At the time it approached the Bank with its proposal, Titan had very little experience in management of a casino gambling business and virtually no experience in the operation of an ocean going vessel.[7]

---

[4] Prior to trial, the parties stipulated to fifty-four (54) paragraphs containing facts deemed by the parties to be material to this litigation.  *See* R. Doc. 134.  As the Court recounts the background facts of this case, it will note those facts to which the parties have stipulated and differentiate them from the Court's factual findings.  Citations to Record Document 134 indicate stipulations, while citations to other documents and trial testimony indicate the Court's findings of fact.

[5] The Bank is a corporation organized under the laws of the State of Illinois and having its principal place of business in the State of Illinois.

[6] Titan purchased the Sapphire Express in May 2004 for $1.7 million.  R. Doc. 134 at ¶ 20.  Titan purchased the Emerald Express in May 2004 for $1.61 million.  *Id.* at ¶ 21.  After it purchased the Shuttles, Titan contracted with a shipyard in Panama City, Florida, named Eastern Shipbuilding Group ("Eastern Shipbuilding"), to perform extensive repairs to and outfitting of the Shuttles.  R. Doc. 134 at ¶ 23.  The work on the Sapphire Express was completed in approximately May 2005 at a cost of $518,983.25.  *Id.*  The work on the Emerald Express was never completed.  R. Doc. 134 at ¶ 24.  The fate of the Shuttles will be discussed in greater detail below.

[7] *See* Trial Exhibit 6 (Titan's business plan).

3.      The Bank employed Carter Klein ("Mr. Klein") of Jenner & Block, LLP in Chicago as its legal counsel in connection with the loan.[8]

4.      In connection with its application for the loan, Titan presented the Bank with a March 31, 2004 survey of the Ocean Jewel prepared by Noble Denton Marine, Inc. ("Noble Denton") that appraised the vessel's value at the time at $25 million and projected the vessel's value would increase to $44.8 million when all repairs were complete.[9]  Titan also presented the Bank with a survey of the Sapphire Express done by a qualified marine surveyor named Alan Conroy ("Mr. Conroy") in which Mr. Conroy appraised the vessel's fair market value at the time at between $2 million and $2.2 million.[10]

5.      On August 16, 2004, the Bank approved a loan of up to $18 million to Titan for its planned offshore gaming venture.  The loan closed on October 14, 2004.[11]

6.      As collateral for the loan, the Bank was to receive preferred ship mortgages on all three vessels.[12]

## II.      The Title Insurance Policies

7.      In researching the risks to which the Bank's ship mortgages might be subject, Mr. Klein came across plaintiff First American Transportation Title Insurance Company's

---

[8] R. Doc. 134 at ¶ 3.

[9] *See* Trial Exhibit 7 at p. 3.  As of the date of the Noble Denton survey, approximately 65% to 70% of the planned repair work on the Ocean Jewel was complete.  *Id.*

[10] R. Doc. 134 at ¶ 20.

[11] R. Doc. 134 at ¶ 8.

[12] R. Doc. 134 at ¶ 1.

("FATTIC")[13] website and learned of its vessel title insurance coverage for lenders.[14] Until accessing FATTIC's website, Mr. Klein was unaware that vessel title insurance even existed.[15]

8.    After reviewing FATTIC's website and other marketing materials, Mr. Klein contacted a FATTIC representative regarding the possibility of the Bank purchasing a vessel title insurance policy in connection with the loan to Titan.  Mr. Klein was then referred to Victor Koock, FATTIC's general counsel, and Hughes Grahan, a New Orleans attorney retained by FATTIC.  In arranging for the issuance of the title policies, Mr. Klein dealt primarily with Mr. Grahan.[16]  After his discussions with Mr. Grahan and Mr. Koock, Mr. Klein recommended to the Bank that it obtain vessel title insurance policies in connection with the loan to Titan, and the Bank decided to make the policies a condition of its loan commitment to Titan.[17]

9.    As they worked to finalize their negotiations, Mr. Klein and Mr. Grahan negotiated three specific endorsements to the typical FATTIC policy.[18]  Those three endorsements were:

      a.    An endorsement altering the language of two covered risks in the typical

---

[13] FATTIC is a corporation organized under the laws of the State of Louisiana and having its principal place of business in the State of Louisiana.

[14] R. Doc. 134 at ¶ 4.

[15] *Id.* at ¶ 5.

[16] R. Doc. 134 at ¶ 7.

[17] *See* Brian Hagen Dep., Vol. I, 39:11 - 47:15, Aug. 23, 2007.

[18] The "typical" FATTIC vessel title insurance policy was drafted by a team of FATTIC executives, including Wayne Condict, FATTIC's senior national underwriter, and a team of outside maritime counsel. Mr. Condict testified that FATTIC's typical policy was prepared by adapting the standard American Land Title Association ("ALTA") real estate loan policy.  *See* Condict Dep., 15:19 - 18:1, Sept. 11, 2012.

FATTIC policy to ensure that the policies' coverage would extend to the foreign-flagged Ocean Jewel and the foreign-flagged Shuttles by modifying Covered Risk 11 to provide that the Bank's mortgages had the equivalent priority of a first preferred ship mortgage under 46 U.S.C. § 31322 and by modifying Covered Risk 14 to provide that the policies would insure the Bank's mortgages' priority over statutory necessaries liens (as defined by 46 U.S.C. § 31301 or its equivalent under the law of Panama for the Shuttles and the law of St. Vincent and the Grenadines for the Ocean Jewel) provided to the Ocean Jewel or either of the Shuttles before and after the date of the policies, regardless of the date those liens arose;[19]

b.   An endorsement that called for the Ocean Jewel policy and the Shuttles policy to cross-reference each other, thus aggregating the amount of insurance for the two policies so that the combined coverage under the policies was $18 million;[20] and

c.   An endorsement dealing with advances made pursuant to the terms of the loan and the priority such advances would enjoy over most other liens and encumbrances.[21]

10.   On October 12, 2004, FATTIC issued to the Bank a commitment to insure the Ocean

---

[19] *See* R. Doc. 134 at ¶¶ 11-14.

[20] R. Doc. 134 at ¶ 15.

[21] R. Doc. 134 at ¶ 16.

Jewel,[22] and on January 23, 2005, FATTIC issued EAGLE Protection Vessel Loan Policy No. 00773 ("Policy No. 773" or the "Ocean Jewel Policy") to the Bank for the Casino Ship Ocean Jewel of St. Petersburg, with coverage relating back to October 12, 2004.[23]

11.    Also on October 12, 2004, FATTIC issued to the Bank a commitment to insure the Shuttles,[24] and on January 23, 2005, FATTIC issued EAGLE Protection Vessel Loan Policy No. 00778 ("Policy No. 778" or the "Shuttles Policy").[25] Like the Ocean Jewel Policy, coverage under the Shuttles Policy related back to October 12, 2004.[26]

12.    The three endorsements described above were added to both Policy No. 773 and Policy No. 778.

13.    Subsequent to the issuance of Policy No. 773 and Policy No. 778, the Bank loaned an additional principal amount of $10 million, for a total principal amount loaned of $28 million.[27] On or about January 21, 2005, FATTIC issued a fourth endorsement to each of the policies which changed the insured amount of $18 million (subject to an Aggregation Endorsement) to reflect an insured amount of $28 million.[28]

---

[22] Trial Exhibit 41.

[23] *See* Trial Exhibit 45.

[24] Trial Exhibit 49.

[25] *See* Trial Exhibit 72.

[26] *Id.*

[27] R. Doc. 134 at ¶ 17.

[28] R. Doc. 134 at ¶ 18.

### III.    Titan's Business Failure and Subsequent Bankruptcy Filing

14.    Titan began its offshore gaming operation in December 2004, and, almost immediately, it became clear to all involved that Titan's business model would not work for a variety of reasons, some of which were the fault of Titan and some of which were not, but all of which meant the business was likely to fail from the start.[29]  By May 2005, Titan had already used most of the money it borrowed from the Bank and was running behind on paying creditors such as PDS Gaming Corporation ("PDS"), the company that leased Titan the gaming equipment used on the Ocean Jewel.[30]  Titan quickly defaulted on its lease to PDS[31] and, when it became clear that Titan could not cure the default, Titan had no option but to file for bankruptcy.[32]

15.    On August 1, 2005, Titan filed for reorganization under Chapter 11 of the United States Bankruptcy code.[33]

16.    As Titan careened toward bankruptcy, the Bank retained the services of Ronald Peterson and John Keller to represent it in connection with the bankruptcy proceeding and retained the services of Fred Caruso, a workout specialist, to advise the Bank on how to minimize the loss it would suffer on the loan as a result of Titan's failed business.[34]

---

[29] *See* Hagen Dep., Vol. I, 43:17 - 48:16, 49:24 - 56:8, 69:13 - 84:25, Aug. 23, 2007.

[30] *See* Hagen Dep. Vol. III, 6:10-23, Sept. 11, 2007.

[31] *See* Hagen Dep. Vol. III, 6:10-16; Trial Exhibit 94 (PDS' notice of default to Titan).  The Bank also placed Titan in default.  *See* Trial Exhibit 96.

[32] *See* Hagen Dep. Vol. III at 7:11-15.

[33] Trial Exhibit 101.

[34] *See* Trial Exhibit 125.

17.     After consultations with Mr. Caruso, the Bank decided to provide debtor-in-possession ("DIP") financing to Titan to allow it to continue operation during the pendency of the bankruptcy.[35]  Specifically, Mr. Caruso testified at trial that he advised the Bank to provide this DIP financing to avoid exposure to the significant penalties Titan would otherwise incur under the federal Worker Adjustment and Restraining Notification ("WARN") Act.[36]  Once the WARN Act notice period came to a close, however, and after discussing with Mr. Caruso the fact that the Ocean Jewel was due for an expensive dry docking before it could be re-certified, which Titan could not afford, the Bank made the decision to cease DIP financing to Titan sometime in fall 2005.[37]  On October 16, 2005, Titan ceased all business operations in connection with its offshore gaming venture.[38]

18.     Between August 1, 2005 and October 14, 2005, the Bank advanced a total of $1,420,382 to Titan as DIP financing.[39]  Titan also consumed an additional $750,000 in casino cash during this time period to fund its operations.[40]

### IV.     The Post-Bankruptcy Fate of the Ocean Jewel and the Shuttles

19.     Meanwhile, shortly after Titan filed for bankruptcy but before Titan ceased business operations, the Bank had all three vessels appraised by Norman Dufour, a qualified

---

[35] *See* October 23 Trans. 193:1-2.

[36] *See id.* at 190:24 - 193:2.  Among other things, the WARN Act penalizes companies that fail to provide sufficient advance notification to workers before mass layoffs.  *See* 29 U.S.C. §§ 2101-2109.

[37] *See* October 23 Trans. at 195:24 - 201:16; *see also id.* at 240:10-16 (Mr. Caruso' testimony at trial regarding the Bank's decision to cease DIP financing, a decision that "was driven by the cost/benefit analysis of continuing the funding of the operation versus closing the operation").

[38] R. Doc. 134 at ¶ 35.

[39] *See* Trial Exhibit 318-1.

[40] *See id.*

marine surveyor and appraiser.  Mr. Dufour concluded that, as of August 1, 2005, the Ocean Jewel had a fair market value of $10.8 million, an orderly liquidation value of $6 million, and a forced liquidation value of $2 million.[41]  Mr. Dufour concluded that, as of that same date, the Sapphire Express had a fair market value of $2 million, an orderly liquidation value of $1.5 million, and a forced liquidation value of $1.2 million.[42]  Finally, Mr. Dufour concluded that the hull of the Emerald Express was worth $200,000.[43]

### A.    The Ocean Jewel and the Sapphire Express

20.   On December 22, 2005, the Titan bankruptcy estate moved to sell most of its assets, save the Emerald Express,[44] at a bankruptcy auction.[45]  The auction was set for January

---

[41] Trial Exhibit 99; *see also* October 24 Trans. at 20:17-19; *id.* at 22:-22-24; *id.* at 25:14-16.

[42] Trial Exhibit 103; *see also* October 24 Trans. 28:8 - 33:6.

[43] Trial Exhibit 105; *see also* October 24 Trans. at 37:10 - 38:9. With respect to the hull of the Emerald Express, Mr. Dufour opined at trial that the hull had the same value regardless of whether it was sold at fair market value, at an orderly liquidation, or at a forced liquidation.  Mr. Dufour appraised the "rebuilt value" of the Emerald Express' two jet drives at $55,000 each and the "replacement" value of the vessel's jet drives at $150,000 each.  Mr. Dufour also appraised the rebuilt value of the vessel's two reduction gearboxes at $45,000 each, the replacement value of the reduction gearboxes at $150,000 each, the rebuilt value of the vessel's two engines at $85,000 each, and the replacement value of the engines at $150,000 each.  At trial, Mr. Dufour also stated that the rebuilt value of the vessel's two generators was $5,000 for each generator.  *See* October 24 Trans. at 39:12 - 41:7.

[44] As explained below, at this time the Emerald Express' hull was located at Eastern Shipbuilding's shipyard in Panama City, its engines were at a Carey's Diesel, Inc. ("Carey's Diesel") repair shop in Delaware, and its gear drives were in the possession of Gear Services, Inc. ("Gear Services") a repair shop in Harvey, Louisiana.  Because Titan had ceased payments to Eastern Shipbuilding, Carey's Diesel, and Gear Services, none of these entities finished work on the respective parts.  After Titan stopped paying, Eastern Shipbuilding, Carey's Diesel, and Gear Services all asserted liens for necessaries against the Emerald Express.  On January 19, 2006, Titan's estate moved to abandon the Emerald Express, which neither FATTIC nor the Bank opposed, and the bankruptcy court approved the abandonment on February 15, 2006.  *See* R. Doc. 134 at ¶ 36.  The ultimate fate of the Emerald Express will be discussed in greater detail below.

[45] *See* Trial Exhibit 162; Trial Exhibit 174.

9, 2006.[46]    At the bankruptcy auction, Yamashiro Financial Services, Inc. ("Yamashiro") was the winning bidder for the Ocean Jewel and the Sapphire Express as well as a barge, a truck, and several trams owned by Titan's estate.[47]

21.    Before the sale could be consummated, however, the Sapphire Express sank at her moorings on January 24, 2006 while docked at Tampa Bay Shipbuilding & Repair Company ("Tampa Bay Shipbuilding") in Tampa, Florida.[48] As a result, Yamashiro was no longer willing to purchase the Sapphire Express, but still desired to purchase the other assets.[49]

22.    Yamashiro, Titan's estate, the Bank, and FATTIC re-negotiated the sale price for the Titan assets and determined that a $500,000 reduction in the total price would appropriately account for the fact that the Sapphire Express was no longer a part of the sale.[50]  The bankruptcy court approved the revised sale agreement on February 13, 2006,[51] and on February 17, 2006, the Ocean Jewel, barge, truck, and trams, were sold in the bankruptcy court to Yamashiro, free and clear of all liens, for a gross amount of $6,795,000. Of this gross purchase price, $345,000 was allocated to assets other than Ocean Jewel, bringing the net Ocean Jewel purchase price to $6,450,000. Of the net purchase price, $128,669 total in payments were made to Tenmark Marine, Tampa Bay

---

[46] *See* Trial Exhibit 162.

[47] *See id.*

[48] *See* Trial Exhibit 178.

[49] Trial Exhibit 185.

[50] *See id.*

[51] Trial Exhibit 189.

Shipbuilding, and to refund registration fees to Yamashiro, leaving $6,321,331 remaining for the Secured Creditors Fund. Of that amount, $1,110,000 was carved out for the benefit of the Titan bankruptcy estate. From the carve-out, $123,700 was reimbursed for debtor-in-possession administrative advances, leaving net proceeds to the Secured Creditors Fund of $5,335.031. Finally, after holders of certain pre- and post-petition necessaries liens covered by the Ocean Jewel title policy received $1,162,815 from the Secured Creditors Fund, a balance of $4,172,215 was paid to the Bank. In May 2007, FATTIC tendered $1,162,287.02 to the Bank under the Ocean Jewel Policy.[52]

23.    On May 3, 2006, the Titan estate moved to abandon the sunken Sapphire Express, which neither FATTIC nor the Bank opposed.[53] On June 5, 2006, the bankruptcy court approved the abandonment.[54] Also in June 2006, the Bank received a payment from the Sapphire Express' hull insurer in the amount of $650,000 on the claim made as a result of the vessel's partial sinking.[55] After the Sapphire Express was abandoned by Titan in its bankruptcy case, Tampa Bay Shipbuilding subsequently had the vessel arrested[56] and purchased it, free and clear, at an admiralty Marshal's sale held on

---

[52] R. Doc. 134 at ¶ 50.

[53] R. Doc. 134 at ¶ 38.

[54] *Id.*

[55] R. Doc. 134 at ¶ 39.  As of October 19, 2004, the Shuttles were insured under a hull insurance policy, Policy No. N01186140 002 issued by ACE USA, for a value of $2 million each, and the Ocean Jewel was insured under the same policy for $35 million.  *Id.* at ¶ 22.  After the Sapphire Express sank, the Bank made a claim ACE USA under this hull insurance policy, and, as loss payee, the Bank was authorized to settle its claim under the policy for the $650,000 amount it ultimately received.

[56] After Tampa Bay Shipbuilding filed its admiralty  arrest proceeding against the Sapphire Express,  *see* Trial Exhibit 222, the Bank recommended that no action be taken in connection with the arrest proceeding.  *See* Trial Exhibit 231.  FATTIC agreed with the Bank's recommendation.  *Id.*

October 11, 2006 for \$99,227 by a credit bid.[57]  Of this amount, \$88,712 was for superpriority bankruptcy claims and \$10,515.38 was for necessaries liens.[58]  The total necessaries liens asserted against the vessel were \$824,311.51.

### B.    The Emerald Express

24.    On January 19, 2006, Titan's estate moved to abandon the Emerald Express.[59]  Neither the Bank nor FATTIC opposed the abandonment.[60]  On February 15, 2006, the bankruptcy court granted the estate's motion.[61]

25.    At the time of the abandonment, the Emerald Express' engines had already been removed from the vessel and sent to Carey Diesel in Delaware to be rebuilt.[62]  In addition, the vessel's jet drives had been sent to Gear Services in New Orleans to be rebuilt.[63]

26.    Approximately eighteen months after it was abandoned in the bankruptcy proceeding, Eastern Shipbuilding had the hull of the Emerald Express arrested and purchased it, free and clear, at an admiralty Marshal's sale held on August 13, 2007 for a credit bid

---

[57] R. Doc. 134 at ¶ 40.

[58] *See* Trial Exhibit 190 (February 15, 2006 bankruptcy court order granting Tampa Bay Shipbuilding's motion to have its post-petition charges declared super-priority claims because those charges were incurred in keeping safe an asset of the Titan bankruptcy estate).  In the context of a bankruptcy proceeding, a "superpriority claim" is one treated as an administrative expense claim "with priority over any or all [other] administrative expenses."  11 U.S.C. § 364(c)(1).

[59] R. Doc. 134 at ¶ 36.

[60] *See* Trial Exhibit 176 (email exchange between Mr. Keller and Mr. Hull).

[61] R. Doc. 134 at ¶ 36.

[62] R. Doc. 134 at ¶ 33; *see also supra* note 44.

[63] R. Doc. 134 at ¶ 32.

of $10,000.[64]  The $10,000 represented only a small portion of the $597,352.72 in necessaries liens asserted by Eastern Shipbuilding against the vessel.   The total necessaries liens asserted against the vessel were $813,061.11.[65]

27.   The Bank realized nothing from the Marshal's sale of either shuttle.[66]

### V.   FATTIC's Settlement of and Defense Against the Necessaries Liens Asserted Against the Ocean Jewel and the Shuttles

28.   On or about September 2, 2005, the Bank (through counsel John Keller) gave formal written notice to FATTIC that it was asserting a claim under the Policies with respect the Ocean Jewel and both the Shuttles.[67]  Robert Hull, an attorney with FATTIC and an experienced title insurance adjuster, was designated to handle the Bank's claim.[68]

29.   On or about September 28, 2005, the Bank (again through Mr. Keller) submitted additional documentation and information as requested by FATTIC in connection with the Bank's claims under the Policies.[69]

30.   Upon receiving the Bank's claim, FATTIC retained the services of David Reeves, of the Florida law firm of Moseley, Prichard, Knight & Jones,[70] to represent the Bank's

---

[64] R. Doc. 134 at ¶ 43.

[65] Trial Exhibit 239, Ex. 3.

[66] R. Doc. 134 at ¶ 45.

[67] R. Doc. 134 at ¶ 48; *see also* Trial Exhibit 119.

[68] *See* October 22 Trans. at 5:16 - 7:24.

[69] R. Doc. 134 at ¶ 49; *see also* Trial Exhibits 122 and 136.

[70] FATTIC initially hired another lawyer, Michael Conroy, but FATTIC terminated Mr. Conroy's services because FATTIC felt he was not taking action quickly enough.  Mr. Reeves was retained in February 2006.

interests in protecting its mortgages.[71]

31.     Pursuant to the policies, FATTIC was required to provide the Bank with counsel, chosen by FATTIC and at FATTIC's cost, to defend against claims by third parties adverse to the Bank's insured preferred mortgage.[72]  FATTIC also had the right under to, at its own cost, take any necessary action to prevent or reduce loss or damage to the Bank.[73]

32.     After he was retained by FATTIC for the Bank, Mr. Reeves promptly began investigating and reviewing all liens asserted against the Ocean Jewel and the Shuttles in the bankruptcy proceeding, including PDS' lien against the Ocean Jewel and the liens asserted by Eastern Shipbuilding and Gear Services against the Emerald Express. Mr. Reeves prepared spreadsheets summarizing the liens asserted against each of the three vessels.[74]

33.     On August 25, 2006, the Bank submitted a preliminary statement of claim to FATTIC.[75]

34.     On September 21, 2006, Mr. Hull responded to the Bank's preliminary statement of claim as follows:

> [FATTIC's] potential policy liability is equal to the total dollar amount of necessaries claims determined to be prior to the Bank's mortgage and paid out of the [Secured Creditors Fund], limited by the total amount of the [Secured Creditors Fund] which would have been available to the Bank absent those prior necessaries

---

[71] October 23 Trans. at 6:5-23.

[72] *See* Trial Exhibit 45 at p. 3; Trial Exhibit 72 at p. 3.

[73] *See id.*

[74] Trial Exhibit 213.

[75] Trial Exhibit 239; Trial Exhibit 241.

claims.[76]

35.     Mr. Hull also noted Mr. Reeves was still in the process of defending the claims for insured necessaries liens against the Ocean Jewel.[77] Ultimately, Mr. Reeves negotiated and/or settled many of the liens asserted against the Ocean Jewel,[78] and, of the approximately $7 million to $8 million in liens asserted against the vessel, Mr. Reeves was able to reduce that number to $1,162,287.[79]

36.     On May 8, 2007, FATTIC tendered a payment of $1,162,287 to the Bank, contending that amount constituted the entirety of the Bank's insured loss under the terms of Policy No. 773.[80]

37.     On October 12, 2006, Mr. Hull responded to the Bank's claims with regard to the Shuttles.[81] In this letter, Mr. Hull explained that, based on the Bank's proofs of loss as of that date, the Bank had not suffered any insured loss with respect to either of the Shuttles.[82] Essentially, FATTIC explained to the Bank that, because there were no necessaries claims paid ahead of the Bank's insured mortgages on the two Shuttles,

---

[76] Trial Exhibit 243.

[77] Trial Exhibit 243.

[78] *See* R. Doc. 134 at ¶ 46.

[79] October 22 Trans. at 162:22 - 163:3 (initial claim estimate of $7 -$8 million); R. Doc. 134 at ¶ 50 (final amount paid of $1,162,805).

[80] R. Doc. 134 at ¶ 50; *see also* Trial Exhibit 264.

[81] Trial Exhibit 245.

[82] *Id.* In addition to Mr. Hull's letter sent on behalf of FATTIC, Mr. Reeves testified at trial that, after the Titan estate abandoned the Shuttles during the course of the bankruptcy proceeding, and with the agreement of the Bank, he decided not to make any further efforts, beyond compiling a list of the liens asserted, to defend the liens asserted against either of the Shuttles. It is undisputed that FATTIC did not pay off any necessaries liens asserted against the Shuttles. R. Doc. 134 at ¶ 47.

whatever losses the Bank suffered in connection with the mortgages were not losses insured under the Policy.[83]

38.    On July 23, 2007, the Bank submitted a revised proof of claim to FATTIC.[84]  In this revised proof of claim, the Bank acknowledged the amounts paid by FATTIC and the Secured Creditors Fund in connection with the Bank's Ocean Jewel claim.[85]  As with its preliminary proof of loss, the Bank again directed FATTIC's attention to Mr. Dufour's August 2005 survey of the Ocean Jewel, the Sapphire Express, and the hull of the Emerald Express.  Mr. Hull testified at trial that FATTIC considered the Dufour survey in its analysis but that FATTIC dismissed the values assigned by Mr. Dufour as unrealistic because they came from an appraisal done before Titan's bankruptcy, and thus were not probative of the Bank's Shuttles mortgage, considering that the Emerald Express was in pieces around the country, the Sapphire Express had sunk, and neither the Bank nor FATTIC were aware of any potential buyer for either of the two vessels at the time the Bank made its claims.[86]

## VII.    The Shuttles Litigation and Ocean Jewel Litigation

39.    On December 15, 2006, the Bank filed suit against FATTIC with respect to the Shuttles after FATTIC refused to pay anything above the amounts paid to Tampa Bay Shipbuilding and Eastern Shipbuilding, respectively, in the foreclosure sales.[87]

---

[83] Trial Exhibit 245.

[84] Trial Exhibit 272.

[85] *Id.*

[86] *See generally* October 22 Trans. (Mr. Hull's testimony).

[87] R. Doc. 1.

40.   In its complaint, the Bank provided a brief recap of the complicated factual and procedural history of this case and asserted a claim against FATTIC for breach of contract in connection with Policy No. 778, stating that, under the Policy, FATTIC was obligated to pay for "all losses suffered by the Bank as a result of the existence of the Necessaries liens" asserted against the Shuttles.[88]   The Bank seeks damages for those losses in this trial.[89]   In addition, the Bank claims FATTIC wrongfully refused to defend "any lien claims other than those for necessaries" and failed to pay the Bank for "all sums expended [by the Bank] for defense against necessaries claims," which the Bank asserts are also breaches of contract, rendering FATTIC liable to the Bank for "all amounts extended by the Bank in defending against claims" on the two Shuttles.[90] Finally, the Bank claims that FATTIC's handling of the Bank's claims in connection with the Shuttles - specifically, its failure to pay the amounts the Bank claimed were owed under Policy within thirty days of receiving the Bank's proof of loss - was arbitrary and capricious, rendering FATTIC liable to the Bank for all amounts due under the Policy plus 25%, pursuant to Louisiana Revised Statute 22:658(B)(1); that FATTIC breached its duty of good faith and fair dealing and its duty to adjust the Bank's claims fairly and promptly, rendering FATTIC liable to the Bank for damages suffered as a result of these breaches, pursuant to Louisiana Revised Statute 22:1220(A); and that FATTIC is also liable to the Bank for penalties in the amount of two times the damages suffered by the Bank, pursuant to Louisiana Revised Statutes

---

[88] R. Doc. 1.

[89] *Id.*

[90] *Id.*

22:658(A)(3) and 22:1220(C), as a result of FATTIC's alleged breach of the duty of good faith and fair dealing and its breach of its duty to adjust the Bank's claims fairly and promptly and FATTIC's arbitrary and capricious handling of the Bank's claim.[91]

41.   After several months of litigation in connection with the Bank's Shuttles claims, FATTIC filed a motion for partial summary judgment, seeking a judgment as a matter of law "that the measure of indemnity recoverable by the Bank under the title insurance policy is the amount, if any, that the Bank's recovery on its mortgages has been or will be reduced by payments to the holders of priming necessaries liens, but nothing more."[92]

42.   On September 20, 2007, Judge Africk[93] granted FATTIC's motion for partial summary judgment.[94]   Judge Africk agreed with FATTIC that Policy No. 778 limits the Bank's recovery to "the amount by which [the Bank's] recovery on its mortgages was reduced by payments to the holders of the priming liens for necessaries."[95]   Judge Africk also agreed with FATTIC that Policy No. 778 "insure[s] only against those actual damages sustained by reason of a specifically covered risk," and thus the Bank was not entitled to recover "consequential damages" under the policy.[96]   On the Bank's request,[97] Judge

---

[91] *Id.*

[92] R. Doc. 34-1.

[93] On April 4, 2012, these consolidated matters were transferred from Section "I" of this Court to Section "E" of this Court.   R. Doc. 127.   While these cases were pending in Section I, Judge Africk was the presiding judge.

[94] R. Doc. 57.

[95] *Id.*

[96] *Id.*

[97] R. Doc. 60.

Africk certified his interlocutory order as immediately appealable under 28 U.S.C. § 1292(b) and stayed the Shuttles litigation pending the Fifth Circuit's ruling.[98]

43.    While Judge Africk's order regarding FATTIC's motion for partial summary judgment in the Shuttles litigation was pending before the Fifth Circuit, the Bank filed another lawsuit against FATTIC, this time in regards to FATTIC's handling of the Bank's claim under the Ocean Jewel Policy.[99]  The Bank's allegations and prayers for relief in the Ocean Jewel litigation essentially mirror its allegations and prayers for relief in the Shuttles litigation.  At the request of the parties, on May 29, 2008, Judge Africk stayed the Ocean Jewel litigation pending the Fifth Circuit's ruling in the Shuttles litigation.[100]

## VIII.  The Fifth Circuit's Opinion, Subsequent Discovery, and Change of Position by FATTIC

44.    On October 14, 2009, the Fifth Circuit affirmed in part and reversed in part Judge Africk's ruling with respect to the Shuttles and remanded the case back to the trial court for further proceedings.  *See First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 839 (5th Cir. 2009).  The Fifth Circuit affirmed Judge Africk's holding that, as a matter of law, the Bank's recovery under Policy No. 778 is limited only to "actual loss or damage," thus precluding the Bank from recovering any consequential damages.  *Id.* at 837-38. The Fifth Circuit reversed Judge Africk's decision with regard to the measure of the Bank's loss with respect to the Shuttles, however, stating that while it agreed that "FATTIC's liability under the [Shuttles] Policy is limited to the

---

[98] R. Doc. 63.  The Fifth Circuit accepted the interlocutory appeal on November 2, 2007.  *See* R. Doc. 64.

[99] *See* R. Doc. 1 in Civil Action No. 08-1682.

[100] R. Doc. 7.

difference between the value of [the Bank's ship mortgages when unencumbered and the value of [the Bank's] mortgages subject to the necessaries liens . . . the district court erroneously confined the loss in value suffered by [the Bank] solely to the amounts bid at foreclosure sale of [the Shuttles]," when it should have considered "all other relevant information when valuing loss under a title insurance policy." *Id.* Accordingly, the Fifth Circuit held that, because the "determination of the value of [the Bank's] unencumbered ship mortgages and the value of the mortgages subject to the necessaries liens raises genuine issues of material fact based upon any appraisals, the foreclosure proceeds, and other market data," Judge Africk's decision to grant summary judgment in FATTIC's favor was incorrect. *Id.* The Fifth Circuit remanded the case for resolution of those fact issues and for "the determination of the proper date of valuation" of the Bank's insured loss, if any. *Id.*

45. Once the Shuttles litigation returned to Judge Africk's trial docket, the stays in the Shuttles litigation and the Ocean Jewel litigation were lifted, the two cases were consolidated, and both cases were set for trial.[101]  Soon after, the parties began to conduct further discovery in connection with the Bank's Shuttles claims and Ocean Jewel claims.

46. As a part of this discovery process, the Bank noticed the deposition of Scott Colemere, an Eastern Shipbuilding employee, regarding the fate of the Emerald Express after Eastern Shipbuilding purchased the vessel at the Marshal's Sale on September 5, 2007.[102]  Through this deposition, the parties learned that Eastern Shipbuilding tried

---

[101] *See* R. Doc. 72; R. Doc. 76.

[102] *See generally* Colemere Dep., Mar. 9, 2010.

to market the vessel soon after purchasing it but, due to the fact that it was still in pieces at the time, Eastern Shipbuilding's marketing efforts were initially unsuccessful.[103]   The parties also learned that on January 23, 2009, Eastern Shipbuilding finally found a buyer for the Emerald Express: a Honduran company called Petroa, S.A. ("Petroa").[104] Mr. Colemere testified that Petroa paid $500,000 for the vessel's hull, but, because the terms of the sale to Petroa required Eastern Shipbuilding to spend approximately $25,000 to repair the vessel and $29,862.50 to tow it to Alabama to be retrieved by Petroa, Eastern Shipbuilding's net proceeds from this sale were $445,137.50.[105]  Again, this amount was less than the $597,352.72 in necessaries liens asserted against the vessel by Eastern Shipbuilding.[106]

47.   Having been informed that the Emerald Express had been re-sold in 2009 for substantially more than it was sold at the 2007 Marshal's Sale, FATTIC determined that Eastern Shipbuilding's net proceeds from the January 2009 sale of the Emerald Express represented the fair market value that should be used to determine the difference in the Bank's mortgage on the vessel when unencumbered and the value of the mortgage subject to necessaries liens.  FATTIC took the position that, since the fair market value exceeded the amount of the necessaries liens, the difference constituted the Bank's insured loss in connection with the Emerald Express.[107]

---

[103] *Id.* at 92:3 - 94:3, 95:2-20.

[104] *Id.* at 68:3-7.

[105] *Id.* at 68:3-7, 73:18 - 74:2, 99:9-21.

[106] *See* Trial Exhibit 239, Ex. 3.

[107] *See* October 22 Trans. at 100:23 - 101:10; *see also* Trial Exhibit 280.

48.   On June 1, 2010, FATTIC tendered an unconditional payment to the Bank for $450,139.50 under the Shuttles Policy for the Emerald Express.[108]

49.   The parties also took further discovery regarding the Sapphire Express. At the time, the last the parties knew of the vessel's fate was that Tampa Bay Shipbuilding had submitted a winning credit bid in October 2006, and Mr. Hull had made the decision that the entire amount of Tampa Bay Shipbuilding's credit bid was comprised of uninsured superpriority claims. After further discovery, FATTIC learned that on February 8, 2007, Tampa Bay Shipbuilding sold the vessel to Moon Lake Holdings (Panama), Inc. ("Moon Lake") for $350,000, and that Moon Lake resold the vessel that same day to Fjellstrand AS  (the shipyard that had originally built the vessel) for $500,000.[109]

50.   Mr. Hull also learned that, of the $99,227.38 winning credit bid price submitted by Tampa Bay Shipbuilding, only $88,712 was for superpriority claims and the remaining $10,515.38 was for pre-bankruptcy petition necessaries charges.[110] Mr. Hull explained at trial that, after reconsidering his earlier position that the entire amount of the credit bid was comprised of uninsured claims and thus nothing was owed under the Shuttles Policy, he concluded the $10,515.38 in necessaries liens was insured under the Shuttles

---

[108] *See* Trial Exhibit 280 (letter from Mr. Hull to Fred Snow, the Bank's general counsel, explaining FATTIC's decision to pay $450,139.50 in connection with the Bank's Emerald Express claim); Trial Exhibit 281 (FATTIC check payable to the Bank). As noted by FATTIC in its post-trial memorandum, Mr. Hull appears to have made a slight miscalculation of Eastern Shipbuilding's net proceeds from the sale of the hull to Petroa. The Court's calculations reveal those proceeds to be $445,137.50, but Mr. Hull tendered $450,139.50 to the Bank for the Emerald Express.

[109] R. Doc. 134 at ¶¶ 41-42.

[110] *See* Trial Exhibit 280 (letter from Mr. Hull to Mr. Snow explaining FATTIC's decision to pay $10,515.38 in connection with the Bank's Sapphire Express claim); *see also supra* note 50.

Policy[111] and thus this amount represented the difference between the value of the Bank's mortgage when unencumbered and the value of the mortgage subject to insured-against necessaries liens, which in turn equaled the Bank's insured loss under the Shuttles Policy with respect to the Sapphire Express.[112]  Mr. Hull maintained the remaining $88,712 of the credit bid was comprised of uninsured superpriority claims.[113]

51.    On June 11, 2010, FATTIC made an unconditional payment to the Bank of $10,515.38 under the Shuttles Policy for the Sapphire Express.[114]

### IX.    FATTIC's Second Motion for Summary Judgment and Trial

52.    On May 25, 2010, FATTIC filed another motion for summary judgment, this time in connection with the Bank's claim against FATTIC regarding the Ocean Jewel.[115]  In this motion, FATTIC sought dismissal of all the Bank's claims relative to the Ocean Jewel arguing that, unlike the Shuttles, there is "no factual dispute regarding the Section 7(a)(iii) value differential when it comes to the OCEAN JEWEL – the difference between the value of the Bank's mortgage on the OCEAN JEWEL as insured and its value subject to the necessaries liens is $1,162,287," and thus the fact that FATTIC "already has paid the Bank all of its "actual loss or damage . . . sustained or incurred . . . by reasons of [l]ack of priority of the Mortgage issued hereunder over any statutory lien for Necessaries," means the Bank had no viable claim against FATTIC relative to

---

[111] Specifically, under Cover Risk 11, as modified by Endorsement No. 1.

[112] *See* Trial Exhibit 280; *see also* October 22 Trans. at 88:24 - 89:13.

[113] *Id.*

[114] Trial Exhibit 281 (FATTIC check payable to the Bank).

[115] R. Doc. 85.  FATTIC did not re-urge its motion for summary judgment in connection with the Bank's Shuttles claims.  *See* R. Doc. 85-1 at p. 11 n. 7.

the Ocean Jewel.[116]  The Bank opposed FATTIC's motion.[117]  On July 1, 2010, Judge

Africk denied FATTIC's motion for summary judgment, stating that "genuine issues of

material fact preclude summary judgment at this time."[118]

53.     After FATTIC's second motion for summary judgment was denied and these

consolidated cases were transferred to Section E of this Court, the cases were tried

before the Court, sitting without a jury, from October 22, 2012 to October 24, 2012.  In

its case-in-chief, the Bank called Robert Hull; John Keller; Victor Koock; Fred Caruso,

an expert in the fields of financial analysis, corporate restructuring, and the winding

down of companies;  Norman Dufour, an expert in the field of marine vessel surveying

and appraisal; and George Panzeca, an expert in the fields of accounting and forensic

accounting.  In its case-in-chief, FATTIC called David Reeves; and Charles "Chuck"

Hansen, an expert in the fields of real property transactions, secured lending, and title

insurance.  In addition, the following depositions were jointly introduced into evidence

in lieu of live testimony: Carter Klein,[119] John Keller,[120] Brian Hagen,[121] Wayne

---

[116] R. Doc. 85-1 at p. 12.  FATTIC also argued Policy No. 773 does not authorize the Bank to recover from FATTIC any "preservation and holding costs" or professional fees  associated with the Bank's decision to provide DIP financing to Titan from August 2005 to October 2006.  *See id.* at pp. 19-21. Finally, FATTIC argued that the Bank's bad faith claims must also fail.  *See id.* at pp. 22-23.

[117] R. Doc. 89.

[118] R. Doc. 103.

[119] Mr. Klein was retained by the Bank in connection with the Bank's loan to Titan, and Mr. Klein initiated the Bank's communications with FATTIC.

[120] Mr. Keller was one of the attorneys retained by the Bank in connection with Titan's bankruptcy and its claims against FATTIC.

[121] Mr. Hagen was a Bank executive at the time Titan approached the Bank for financing.

Condict,[122] Scott Colemere,[123] Espen Tandberg,[124] and Richard Watler.[125]

## CONCLUSIONS OF LAW

### I.      Jurisdiction and Venue

1.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000. Pursuant to the terms of the two policies, venue is proper in this Court.

### II.      The Relevant Policy Provisions

2.      The Ocean Jewel Policy[126] and the Shuttles Policy[127] both contain the following relevant provisions:

   a.      The policies insure "against actual loss or damage . . . sustained or incurred by [the Bank] by reason of" nineteen enumerated "covered risks."[128] Accordingly, the policies explicitly provide coverage for the following covered risks that are relevant in this case:

---

[122] Mr. Condict was a FATTIC underwriter and played a key role in the drafting of FATTIC's vessel title insurance policy.

[123] Mr. Colemere was the Rule 30(b)(6) corporate representative of Eastern Shipbuilding.

[124] Mr. Tandberg was the Rule 30(b)(6) corporate representative of Moon Lake.

[125] Mr. Watler was the Rule 30(b)(6) corporate representative of Gear Services.

[126] Trial Exhibit 45.

[127] Trial Exhibit 72.

[128] *See* Trial Exhibit 45 at p. 1 ("Covered Risks" section of Policy No. 773); Trial Exhibit 72 at p. 1 ("Covered Risks" section of Policy No. 778).

- "Unmarketability of the Title";[129]

- "The failure of the Insured Preferred Mortgage to have the equivalent priority of a Preferred Mortgage as defined in 46 U.S.C. § 31322";[130] and

- "Lack of priority of the lien of the Insured Preferred Mortgage over any statutory lien for Necessaries (as that term is defined in 46 U.S.C. § 31301 or its equivalent under the law of [Panama in the Shuttles Policy] [St. Vincent & the Grenadines in the Ocean Jewel Policy] provided to the Vessel prior to or after Date of Policy whether or not the statutory lien for Necessaries arises prior to or after Date of Policy."[131]

b.   Under Section 4 of the policies, entitled "Defense and Prosecution of Actions; Duty of Insured Claimant to Cooperate," once it received notice of a claim, FATTIC had the right and duty to exercise control over the defense and handling of insured necessaries liens.[132]  FATTIC was required to provide the Bank with counsel, chosen by FATTIC and at FATTIC's cost, to defend against claims by third parties adverse to the Bank's insured preferred mortgage.[133]  Upon written request by the Bank, FATTIC was required to provide this defense "without unreasonable delay."[134]  FATTIC also had the right under this same Condition in the policy to, at its own cost, take any necessary action to prevent or reduce

---

[129] Trial Exhibit 45 at p. 1 (Covered Risk 3); Trial Exhibit 72 at p. 1 (Covered Risk 3).  Section 1(j) of the policies defines unmarketability of title as "an alleged or apparent matter affecting the vessel's title that would entitle a purchaser of the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of a good and valid title."  Trial Exhibit 45 at p. 2; Trial Exhibit 72 at p. 1.

[130] Trial Exhibit 45 at p. 1 (Covered Risk 11, as modified by Endorsement No. 1); Trial Exhibit 72 at p. 1 (Covered Risk 11, as modified by Endorsement No. 1).

[131] See Trial Exhibit 45 at p. 1 (Covered Risk 14, as modified by Endorsement No. 1); Trial Exhibit 72 at p. 1 (Covered Risk 14, as modified by Endorsement No.

[132] Trial Exhibit 45 at p. 3; Trial Exhibit 72 at p. 3.

[133] *See* Trial Exhibit 45 at p. 3; Trial Exhibit 72 at p. 3.

[134] *Id.*

loss or damage to the Bank.[135]   FATTIC was required to exercise this right "diligently."[136]

c.      Under Section 6 of the policies, entitled "Options to Pay or Otherwise Settle Claims; Limitation of Liability," FATTIC had four options to choose from in case of claims brought by the Bank under either policy.[137] FATTIC chose the fourth both of the Bank's claims.   That fourth option provides that FATTIC could choose:

> [t]o pay or otherwise settle with the Insured Claimant the loss or damage provided under [the policies], together with any costs, attorney's fees or expenses incurred by the Insured Claimant which were authorized by [FATTIC] up to the time of payment and which the Company is obligated to pay.[138]

d.      Under Section 7 of the policies, entitled "Determination and Extent of Liability," there were three alternative methods of calculating the extent of FATTIC's liability;[139] in this case, the parties agree that the third option is the appropriate method to use.   That third method of calculating the extent of FATTIC's liability, which is contained in Section 7(a)(iii) of the policies, provides as follows:

---

[135] *Id.*

[136] *Id.*

[137] Trial Exhibit 45 at p. 4; Trial Exhibit 72 at p. 4.

[138] *Id.*  Defense expert Chuck Hansen explained that a title insurer's decision to choose this option and pay only the amount it determined was a true loss by the insured, after first defending against any potentially insured liens, is proper practice in handling title insurance claims such as the ones asserted by the Bank.  *See* October 24 Trans. at 169:4 - 190:11.

[139] Trial Exhibit 45 at p. 4; Trial Exhibit 72 at p. 4.  Mr. Condict also testified that Section 7 was intended to provide the method by which "actual loss or damage" is to be measured.  Condict Dep. 32:25 - 34:1, Sept. 11, 2012.

The liability of the Company under this Policy shall not exceed the least of . . .

The difference between the value of the Title as insured and the value of the Title subject to the defect, lien or encumbrance insured against by this policy; provided, however, that this Section 7(a)(iii) shall not apply when the defect, lien, encumbrance or other matter insured against by this policy results in a total failure of the lien of the Insured Preferred Mortgage to attach to the Title.[140]

e.       Under Section 8 of the policies, entitled "Limitation of Liability," FATTIC is considered to have fully performed its obligations if it removes an alleged defect, lien or encumbrance, cures a claim of Unmarketable Title, or otherwise establishes the lien of the insured mortgage, and is thus not liable for any loss or damage caused by the claim defect, lien, etc.[141]  Section 8 also provides that FATTIC "shall not be liable for any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the Insured Preferred Mortgage and secured thereby and reasonable amount expended to prevent deterioration of the Vessel."[142]

### III.    Applicable Law

3.       Both policies explicitly provide that Louisiana law applies to disputes arising thereunder.[143]  The parties agree Louisiana law applies to this dispute.

---

[140]  Trial Exhibit 45 at p. 4; Trial Exhibit 72 at p. 4.  The Fifth Circuit's interpretation of this provision, which is binding on this Court, is that "FATTIC's liability . . . is limited to the difference between the value of [the Bank's] ship mortgages when unencumbered and the value of [the Bank's] ship mortgages subject to the necessaries liens."  *First Am. Bank*, 585 F.3d at 837-38.

[141]  Trial Exhibit 45 at p. 4; Trial Exhibit 72 at p. 4.

[142]  *Id.*

[143]  Trial Exhibit 45 at p. 5; Trial Exhibit 72 at p. 5.

4.      In its opinion reviewing Judge Africk's grant of summary judgment in FATTIC's favor in connection with the Shuttles litigation, the Fifth Circuit summarized the basic tenets of Louisiana insurance law as follows:

> Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code. [*Bonin v. Westport Ins. Corp.*, 2005-0886 (La. 5/17/06); 930 So.2d 906, 910]; *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 516 (5th Cir.2005).  The words used in an insurance policy must be given their generally prevailing meaning.  LA. CIV. CODE ANN. art. 2047; *Bonin*, 2005-0886, at p. 5; 930 So.2d at 910; *Coleman*, 418 F.3d at 516.  "[W]hen the 'language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation.'"  *Coleman*, 418 F.3d at 518 (quoting *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94); 630 So.2d 759, 764); *see also* LA. CIV. CODE ANN. art. 2046. Further, each provision of an insurance policy "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE ANN. art. 2050; *Coleman*, 418 F.3d at 517. Insurance policies "should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."  *Coleman*, 418 F.3d at 517; *Bonin*, 2005-0886, at p. 5; 930 So.2d at 910-11; *see also* LA. CIV. CODE ANN. art. 2049 ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.").

*First Am. Bank*, 585 F.3d at 837.

5.      Because vessel title insurance is rare, cases from Louisiana and elsewhere applying land title insurance law are relevant to the Court's analysis.

### IV.    The Measure of the Bank's Insured Loss Under Section 7(a)(iii)

#### A.    The Parties' Arguments

6.      The parties agree Section 7(a)(iii) of the policies provides the appropriate method for measuring FATTIC's liability to the Bank, if any, under the two policies.  The parties

do not agree, however, on the practical application of Section 7(a)(iii) to the facts of this case. The parties disagree on the relevant dates for determination of the difference in value of the Bank's title as insured and the value of the title subject to insured necessaries liens. The date the difference in the values is determined is important because the difference between the two values is the amount FATTIC owes on the policies. The Court will address the parties' arguments with respect to the determination of the date of valuation insofar as it affects the difference in values first, followed by the arguments with respect to the difference in values in this case and the measure of FATTIC's liability.

### 1.   The Bank's Arguments Regarding the Date of Valuation of FATTIC's Liability

7. The Bank argues the policies are ambiguous as to the date of valuation of its loss under Section 7(a)(iii). The Bank argues the appropriate date of valuation of its title, as insured, is August 2005, which is the date Titan filed for bankruptcy and the date the necessaries liens asserted against the vessels were "discovered." In support of this argument, the Bank relies on two treatises, D. DARLOW BURKE, THE LAW OF TITLE INSURANCE (Aspen Law & Business, 3d Ed. 2000) ("Burke") and JOYCE D. PALOMAR, TITLE INSURANCE LAW (Thomson Reuters 2011-2012 Ed.) ("Palomar"), both of which state that, in the context of land title insurance, the date of valuation should be determined in a way that places the risk of loss on the insurer once the insurer takes control of the handling of the insured defects because the insurer's handling of the insured title defects could adversely affect the measure of the insured's loss. *See* Palomar at § 10:16 (explaining that while the 1992 ALTA land title policy form, from

which the FATTIC policies are derived, does not provide a date of valuation, ALTA recognized this problem and ALTA's 2006 loan policy form now gives the insured lender the option of using "either the property's value on the date the insured makes a claim or the property's value on the date that claim is settled and paid"); Burke at § 7.04 (explaining that when the insurer takes control of the handling, defense, and resolution of lien claims, the insured should not be required to bear the risk associated with the insurer's control of the claim starting the moment the title defect is discovered).

8. Essentially, the Bank argues it should not be punished for FATTIC's exercise of its right to spend time and money defending liens asserted against the vessel before the vessels could be sold. The Bank argues its loss should be measured as of the moment the title defect became apparent in August 2005.

### 2. FATTIC's Arguments Regarding the Date of Valuation of its Liability

9. FATTIC agrees the date of valuation of the vessels is relevant for some purposes.

10. With respect to the Ocean Jewel and the Sapphire Express, FATTIC avers the appropriate date for determining its liability is the dates the vessels were sold - February 2006 for the Ocean Jewel and October 2006 for the Sapphire Express - because those vessels were sold for fair market value and thus the amounts paid at judicial sale should be used to determine the impairment of the Bank's mortgages on those vessels due to insured-against necessaries liens.

11. With respect to the Emerald Express, FATTIC contends the January 2009 $445,137.50 net resale price of the vessel, rather than the $10,000 paid at the September 2007

judicial sale, should be used to determine the amount by which the Bank's mortgage was impaired due to insured-against necessaries liens.

### 3.    The Bank's Arguments Regarding its Insured Losses

12.    The Bank contends that Section 7(a)(iii) applies in the same manner to both the Ocean Jewel claim and the Shuttles claim, and that for all three vessels, the "insured loss for each mortgage is measured by the difference between the unencumbered fair market value of the vessel and the value of the vessel as encumbered."[144]

13.    The Bank contends Mr. Dufour's appraisals of the three vessels, in which he offered his expert opinion on the fair market values of the vessels as of early August 2005, provide the starting point for the Court's calculation of the Bank's loss.

14.    For the Ocean Jewel, the Bank argues its loss is measured by subtracting the $4,172,215 the Bank received as a result of the bankruptcy sale of the vessel from the $10.8 million appraised fair market value of the vessel as of August 2005.  Thus, the Bank argues FATTIC's tender of $1,162,287 was $5,465,498 short.

15.    For the Emerald Express, the Bank argues its insured loss is the $500,000 Eastern Shipyard received as a result of the sale of the hull to Petroa, and thus FATTIC's tender of $450,139.50 was $49,860.50 short.[145]  The Bank argues it also suffered an insured loss of $380,000 - the appraised rebuilt value of the vessel's removed components - bringing the total amount FATTIC owes in connection with the Emerald Express mortgage to $429,860.50.

---

[144] R. Doc. 154 at pp. 3-4.

[145] The Bank disagrees with FATTIC that the costs borne by Eastern Shipbuilding to repair and tow the vessel, which reduced Eastern Shipbuilding's net proceeds, should reduce the Bank's recovery from FATTIC.

16.    For the Sapphire Express, the Bank argues that, because it received nothing as a result of any of the sales of the vessel, its loss equals the $2 million August 2005 appraised fair market value of the vessel, and thus FATTIC's tender of $10,515.38 was $1,989,484.70 short.

17.    In total, the Bank calculates its insured loss on the mortgages as $7,884,893.20.[146]

### 4.    FATTIC's Arguments Regarding the Bank's Insured Losses

18.    With respect to the measure of the Bank's insured loss, FATTIC contends the "application of Section 7(a)(iii) varies depending upon whether the [judicial] sale price of the collateral exceeds the total amount of the liens priming the insured mortgage, such that the insured lender receives some return on the collateral."[147]

19.    FATTIC contends its liability to the Bank in connection with the Ocean Jewel, the sale of which resulted in the Bank receiving some return on its collateral and for which the Bank's return was reduced by payments to holders of insured priming necessaries liens, is measured under Section 7(a)(iii) by determining the extent to which the lender's security is impaired by the covered defect.  As explained above, on the date the vessel was sold, the amount of necessaries liens asserted against the Ocean Jewel was $1,162,827.02.  As a result, with respect to the Ocean Jewel, FATTIC maintains under Section 7(a)(iii) that its liability to the Bank is $1,162,287.02 - the final amount in necessaries liens paid to holders of necessaries liens and thus carved out of the Bank's

---

[146] In addition to these losses, the Bank also contends FATTIC is liable to the Bank for expenses incurred by the Bank to protect the liens of its mortgages and for reasonable amounts expended by the Bank to prevent deterioration of the vessels, as well as statutory damages, attorney's fees, and costs as a result of FATTIC's alleged bad faith handling of the Bank's claims.

[147] R. Doc. 141 at p. 25.

recovery from the sale of the vessel - because its only duty as title insurer is to place the insured in the same position as if the Bank's priority had not been defeated by the necessaries liens.

20. Because it has already tendered $1,162,287.02 to the Bank in connection with the claim on the Ocean Jewel, FATTIC argues it has fulfilled its obligation under the Ocean Jewel Policy.

21. With respect to the Sapphire Express, the Marshal's sale did not result in the Bank receiving any return on its collateral.  The amount of Tampa Bay Shipbuilding's necessaries liens claim was $10,515.38.  The amount of Tampa Bay Shipbuilding's superpriority claims was $88,712.  The total amount of necessaries liens asserted against the vessel was $824,311.51.   FATTIC contends it correctly counted only the insured necessaries liens portion of Tampa Bay Shipbuilding's claim against the vessel as an insured loss under Section 7(a)(iii), as that amount represents an amount the Bank would have recovered in a sale for fair market value but for the insured-against necessaries liens.  FATTIC contends Tampa Bay Shipbuilding's superpriority claims were not insured.

22. With respect to the Emerald Express, the Marshal's sale did not result in the Bank receiving any return on its collateral.  The amount of Eastern Shipbuilding's necessaries lien claim was $597,352.72 and the total amount of necessaries liens asserted against the vessel was $813,061.11. FATTIC contends it correctly counted the $445,137.50 in net proceeds from the January 2009 resale of the hull as an insured loss under Section 7(a)(iii), as that amount represents an amount the Bank would have

recovered in a sale for fair market value but for the insured-against necessaries liens.[148]

23.    Because it has already tendered $10,515.38 to the Bank in connection with the claim on the Sapphire Express and $450,139.50 to the Bank in connection with the Emerald Express, FATTIC argues it has fulfilled its obligations to the Bank under the terms of the Shuttles Policy.[149]

### B.    The Proper Date of Valuation of the Difference Between the Bank's Unencumbered Title and the Bank's Encumbered Title

24.    The Fifth Circuit remanded this case "for the determination of the proper date of valuation" as this date is relevant to the Court's loss valuation. *First Am. Bank*, 585 F.3d at 838.

25.    The Court finds the policies are not ambiguous, as there is only one reasonable interpretation of the Section 7(a)(iii) with respect to the date of valuation and FATTIC's liability. *See, e.g., First Am. Bank*, 585 F.3d at 837; *see also In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 439-440 (5th Cir. 2002) ("[u]nder Louisiana law, a contract is ambiguous when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction. . . . when the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent") (citations, quotation marks, and footnotes omitted).

---

[148] FATTIC maintains it was not wrong when it initially concluded the Bank suffered no insured loss in connection with the sale of the Emerald Express because the vessel sold for only $10,000 - a fraction of the total amount of necessaries liens. FATTIC argues there was no reason to believe the vessel's fair market value was any higher. FATTIC states it gave the Bank the "benefit of the doubt" and used the amount of the net proceeds realized by Eastern Shipbuilding when it sold the Emerald Express to Petroa to determine the insured loss to the Bank.

[149] In fact, FATTIC states it overpaid by approximately $5,000. *See supra* note 108.

26.    The Court finds the policies clearly provide the difference in value of the vessels encumbered and unencumbered must be measured as of the dates the vessels were sold at judicial sale.

27.    The difference must be measured on the date of judicial sale because this is the date on which the Court can determine with certainty the amount of the Bank's insured loss as a result of insured-against necessaries liens.

28.    The Court's holding that the Bank's loss must be measured as of the date of judicial sale is supported by the majority of cases addressing the issue.  *See, e.g., First Internet Bank of Ind. v. Lawyers Title Ins. Co.*, No. 07-869, 2009 WL 2092782, at *6 (S.D. Ind. 2009) (when interpreting a title insurance policy insuring against loss of priority, which policy measures the insured's loss as "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy," and noting that courts have reached "mixed results" on the issue of the proper date of valuation, "[t]he better reasoned cases have  . . . determined loss in a lender's title insurance policy at the date of foreclosure."); *see also Associated Bank, N.A. v. Stewart Title Guar. Co.*, 2012 WL 3067895, at *5 (D. Minn. 2012) ("[T]he majority of courts considering the [date of valuation] issue have held that such loss cannot be measured until the note has been repaid and the security for the mortgage is shown to be inadequate . . . The majority view comports with the nature of a title insurance policy."); *Marble Bank v. Commonwealth Land Title Ins. Co.*, 914 F. Supp. 1252 (E.D.N.C. 1996) ("Since a lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of that loss.  Further, even

though the lender's note is in default, an anticipated loss cannot be measured until completion of foreclosure because only then is there certainty the lender will not be paid in full. Consequently, it is clear that in the typical case the earliest a loss can be claimed on a lender's policy is at the time of completion of foreclosure."); *Karl v. Commonwealth Land Title Ins. Co.*, 24 Cal. Rptr. 2d 912, 919-20 (Cal. App. 1993) ("in the typical case the earliest a loss can be claimed on a lender's policy is at the time of completion of foreclosure"); *Hodas v. First American Title Ins. Co.*, 696 A.2d 1095, 1097 (Me. 1997) ("The presence of a title defect immediately results in a loss to the holder of a fee interest since resale value will always reflect the cost of removing the defect. In contrast, the holder of a loan policy incurs a loss only if the security for the loan proves inadequate to pay off the underlying insured debt due to the presence of undisclosed defects."); *Blackhawk Prod. Credit Ass'n v. Chi. Title Ins. Co.*, 423 N.W.2d 521, 525 (Wis. 1988) (a mortgagee's insured loss is sustained only if the "mortgagee's debt is not repaid and the security for the mortgage proves inadequate," so the loss must be measured as of that date).[150]

29.    Indeed, as the court in *First Internet Bank* recognized when faced with essentially the same issue as is presented in this case - the date of valuation of a mortgagee's loss under a title insurance policy when the priority of the mortgage is overtaken by another lien, a scenario for which the policy provides insurance - the date of loss for a lender

---

[150] The Bank insists on a number of occasions that FATTIC's citation to cases from outside the state of Louisiana on the date of valuation issue is inappropriate and that those other cases are not helpful to this Court's analysis. However, while the Bank directs the Court's attention to two treatises on the issue, the Bank never directs the Court's attention to any case from within this state or any federal case interpreting Louisiana law that is directly on point. As a result, the Court may properly consider how other courts in other states have dealt with the issue, and because those other cases are directly on point, the Court considers the opinions of those other courts to be persuasive. The Court considers the statements of Professors Burke and Palomar persuasive as well.

is measured differently than it would be for an owner of the property, because there is no way of knowing the extent, if any, of the lender's loss until the date the property is actually sold.[151]  2009 WL 2092782, at *6.  For an owner, however, the presence of a title defect "immediately results in a loss to the holder of a fee interest since resale value will always reflect the cost of removing the defect."  *Hodas*, 696 A.2d at 1097; *see also Karl*, 24 Cal. Rptr. 2d at 919-20 ("the discovery of an insured-against lien does not trigger recognition of loss. . . . an anticipated loss cannot be measured until completion of foreclosure because only then is there certainty the lender will not be paid in full").

30.     The Court agrees with the *First Internet Bank* court that, for a mortgagee such as the Bank, using the date the defect is discovered  instead of the date the property against which the insured against liens are asserted is sold would "necessarily require speculation and estimation about the value of the property before it is even certain whether the lender will suffer a loss," and because using the date of foreclosure as the date of valuation "provides a value and loss amount based on a real transaction," the dates of the bankruptcy/foreclosure sales are the most appropriate dates for valuing the Bank's losses as a result of the liens asserted against the vessels.  2009 WL 2092782, at *6.  Despite the Bank's protestations to the contrary, using the date of sale as the date of valuation "does not systematically favor the insurer or the lender," because, in the end, "[m]arket conditions determine which party benefits from the date-of-foreclosure rule."  *Id.*

---

[151] The Court recognizes that the *First Internet Bank* found a similar provision to Section 7(a)(iii) to be ambiguous on the issue of the date of valuation of an insured's loss.  2009 WL 2092782, at *5. However, while the Court disagrees with the *First Internet Bank* court's decision with respect to the ambiguity issue, the Court finds that court's analysis of the date of valuation issue to be instructive.  The Court also notes that even after finding the provision ambiguous, the *First Internet Bank* court nevertheless interpreted the provision in favor of the insurer.  *Id.* at *5-6.

31.   The Court also notes that defense expert Chuck Hansen explained this is the "general industry approach" to determine the appropriate date for valuation of an insured lender's loss.[152]

32.   The Court specifically rejects the Bank's date of valuation theory calling for the Bank's losses, which were not suffered in any determinable way until the vessels were sold, to be measured using out-of-date appraised fair market values that were obsolete at the time of the judicial sales.  All relevant information must be considered in determining the unencumbered value of the vessel on the date of sale, but using an out-of-context, outdated appraisal done years earlier would yield the kind of absurd result Louisiana law explicitly disallows.[153]  *First Am. Bank*, 585 F.3d at 837; *In re Liljeberg*, 304 F.3d at 439-440.  The Court reiterates the only logical date of valuation of the Bank's losses as a result of the necessaries liens taking priority over the Bank's insured mortgages is the date the vessels were sold.

### C.   The Bank's Loss in Connection the Ship Mortgages and the Section 7(a)(iii) Measure of FATTIC's Liability

33.   Having determined the appropriate dates of valuation of the Bank's losses on its mortgages due to insured-against necessaries liens, the Court now turns to the calculation of those losses, if any, taking into consideration all relevant information as to the value of the Bank's mortgages as insured at the relevant times.

34.   The measure of the Bank's insured loss under Section 7(a)(iii) is clear and

---

[152] *See* October 24 Trans. at 176:4-8.

[153]   For example, if a vessel is appraised a week before it is sold, that appraisal is a reliable indication of the true value of the vessel at the time it was sold and the appraisal is properly considered in calculating the insured's loss.  On the other hand, an appraisal done years before a sale is not a relevant consideration because the appraisal is not a reliable indication of the vessel's true value and thus does not serve as a useful comparison to the vessel's "as encumbered" value.

unambiguous. FATTIC's liability under Section 7(a)(iii) is "limited to the difference between the value of [the Bank's] ship mortgages when unencumbered and the value of [the Bank's] ship mortgages subject to the necessaries liens."[154] *First Am. Bank*, 585 F.3d at 837-38.

35.     Stated another way, Section 7(a)(iii) provides that FATTIC is liable to the Bank to the extent the value of the Bank's mortgages was impaired by the existence of insured-against necessaries liens because those liens were given priority over the Bank's mortgages. Whatever other losses the Bank suffered as a result of Titan's business failures - including the fact that the vessels were sold for substantially reduced prices - is the Bank's issue, not FATTIC's, and FATTIC is not responsible for putting the Bank back in the same position it would have been in had Titan's business not failed.[155]

36.     As explained in the Fifth Circuit's opinion in this case, under Louisiana law, when valuing an insured loss in the context of a title insurance policy, the Court is required to take into account not only the price for which the property subject to the mortgage was sold at foreclosure or bankruptcy sale, but also any other available relevant

---

[154] Chuck Hansen testified that this is the standard measure of loss in this situation. *See* October 24 Trans. at 171:22 - 173:15. The majority of cases addressing the issue also hold that the measure of a mortgagee's insured loss under a title insurance policy is the extent to which, if any, the lender's security is impaired by a covered defect in the mortgagee's title in the mortgage. *See, e.g., Narberth Bldg. & Loan Ass'n v. Bryn Mawr Trust Co.*, 190 A. 149, 151 (Pa. 1937); *Cale v. Transamerica Title Ins. Co.*, 225 Cal. App. 3d 422, 275 Cal. Rptr. 107, 109 (1990); *Goode v. Fed. Title & Ins. Corp.*, 162 So. 2d 269, 270-71 (Fla. App. 2 Cir. 1964); *Falmouth Nat'l Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1063 (1st Cir. 1990); Karl, 24 Cal. Rptr. 2d at 916 (1993); *Minnesota Title Ins. & Trust Co. v. Drexel*, 70 F. 194, 198-99 (8th Cir. 1895); *Madison Nat'l Bank v. St. Paul Title Ins. Co.*, 389 F. Supp. 629, 632-33 (N.D. Ala. 1975); *Am.-First Title & Trust Co. v. First Fed. Sav. & Loan Assn. of Coffeeville, Kan.*, 415 P.2d 930, 936 (Okla. 1965); *Atlanta Title & Trust Co. v. Allied Mtg. Co.*, 64 Ga. App. 38, 12 S.E.2d 147, 149 (1940); *Title Ins. Co. of Richland v. Indus. Bank of Richmond*, 156 Va. 322, 157 S.E. 710, 714-15 (1931).

[155] For the record, the Court explicitly rejects the Bank's argument that FATTIC is on the hook for the diminution in the value of the Bank's collateral (i.e., the vessels) as the result of Titan's bankruptcy and the ensuing bankruptcy and foreclosure sales of the vessels. Likewise, the Court rejects the Bank's argument that FATTIC's defense against the liens "caused" Titan's bankruptcy or that its defense "caused" the vessels to lose value.

information relative to the collateral's true value as of the date of the sale. *See First Am. Bank*, 585 F.3d at 838 (citing *Volunteer State Life Insurance Co. v. Union Title Guarantee Co.*, 143 So. 43, 44 (La. 1932)).  The Fifth Circuit specifically mentions appraisals and "other market data" as indicative of the kinds of "other information" the Court should consider in connection with the Shuttles. *Id.* (directing the Court to consider "all . . . relevant information when valuing loss under a title insurance policy," including "appraisals, the foreclosure proceeds, and other market data").  The Fifth Circuit's opinion is binding on this Court's determination of the measure of the Bank's insured loss in connection with both mortgages.[156]  Accordingly, in determining the exact measure of the Bank's losses and the measure of FATTIC's liability under Section 7(a)(iii), the Court will consider the price for which the vessels sold at judicial sale and any other relevant market data indicating the value of the Bank's mortgages (i.e., the value of the Bank's collateral) as of those sale dates.

### 1.    Ocean Jewel

37.    With respect to the Ocean Jewel, the Court finds, after considering all available information relative to the difference in the value of the Bank's mortgage as unencumbered and its value as encumbered on February 17, 2006,[157] the Bank suffered an insured loss of $1,162,287 as the result of the liens asserted against the vessel.  If the necessaries liens asserted by PDS and others had not existed, the Bank would have received additional net proceeds from the sale of its collateral; because they did exist,

---

[156] As the Bank recognizes, there is no reason why the Fifth Circuit's ruling with respect to the Shuttles should not also apply to the Ocean Jewel.

[157] This is the date the Ocean Jewel was sold to Yamashiro.

the Bank's return on the sale of the vessel was reduced by the amount of the liens. This is precisely the kind of loss against which Policy No. 773 insured, and FATTIC timely tendered this amount to the Bank. Accordingly, FATTIC has fulfilled its obligation to the Bank with respect to the Ocean Jewel.

38.     The evidence at trial clearly demonstrates the Ocean Jewel was sold at a bankruptcy sale for a price substantially lower than Mr. Dufour estimated the vessel would sell for under ideal market conditions. That reduction in the vessel's value was brought on by Titan's abysmal business performance and by the passage of time, not by the fact that FATTIC decided to defend against liens asserted against the vessel as it was entitled to do. By its express terms, the Ocean Jewel Policy gave FATTIC the right to defend against liens that could affect the Bank's mortgage. The same policy also states that while any such litigation is pending, FATTIC has "no liability for loss or damage." FATTIC cannot be punished for exercising its right, and the Court finds that FATTIC exercised this right diligently and as efficiently as possible under the circumstances.[158]

39.     For the record, the Court notes that it considered all relevant evidence of difference in the value of the Bank's Ocean Jewel mortgage as unencumbered and the value of the mortgage as encumbered on the date of the foreclosure sale. *See First Am. Bank*, 585

---

[158] The Bank argues time and again that FATTIC is responsible for reimbursing to the Bank not only any actual loss or damage to the Bank as a result of the broken priority, but also those losses suffered by the Bank as a consequence of Titan's business failure and bankruptcy and FATTIC's defense against the liens. The Fifth Circuit has already clearly stated that FATTIC owes no such obligation. *First Am. Bank*, 585 F.3d at 839. FATTIC's policy insured reimbursement for specific kinds of title defects. The policy did not insure the collateral subject to the Bank's mortgage would maintain its value regardless of real world forces. *See* Palomar at § 6:23 ("[C]ourts have distinguished compensable losses caused by title defects from noncompensable losses of the insured lender caused merely by the inadequate value of the real property collateral."); *Blackhawk*, 423 N.W.2d at 525 (a lender's title policy "does not guarantee either that the mortgaged premises are worth the amount of the mortgage or that the mortgage debt will be paid").

F.3d at 838; *Volunteer State Life*, 143 So. at 44.

40.     The Court does not consider the March 2004 appraisal done by Noble Denton or the August 2005 appraisal done by Mr. Dufour to be relevant in its analysis of the Bank's insured loss in February 2006.  The price for which the Ocean Jewel was sold in February 2006 was a true indication of the vessel's value, and the value of the Bank's mortgage on the vessel, as of that date.  There is nothing in the record supporting the Bank's assertion that, on the relevant date, the vessel was worth the amounts quoted in either appraisal, both of which were done well in advance of the vessel's sale.[159]

## 2.     Emerald Express

41.     With respect to the Emerald Express, the Court finds, after considering all available information relative to the difference in the value of the Bank's mortgage as insured and its value as encumbered on August 13, 2007,[160] the Bank suffered an insured loss of $445,139.50 as the result of insured-against necessaries liens.

42.     Even though the vessel was sold in 2007 for $10,000, the Court considered the fact that the vessel's hull was eventually re-sold for a net recovery of $445,137.50 which indicates the Bank's mortgage's true value as of August 2007 was $445,137.50, and not $10,000.  The Court finds the January 2009 net recovery price more probative of the value of the Bank's mortgage on the Emerald Express than the August 2007 foreclosure

---

[159] If anything, Mr. Dufour's appraisal of the vessel supports the Court's conclusion, as his appraisal of the vessel's forced liquidation value is remarkably close to the amount for which the vessel actually sold at the February 2006 bankruptcy sale.  The Court need not dwell on this issue, however, because the evidence presented at trial clearly demonstrates that by reimbursing the Bank the amount by which the value of the Bank's Ocean Jewel mortgage was impaired by the necessaries liens asserted against the vessel, FATTIC did everything it was required to do and paid everything it was required to pay under the terms of the Ocean Jewel Policy.

[160] This is the date Eastern Shipbuilding purchased the Emerald Express at an admiralty foreclosure sale.

sale price.  Because the Bank did not receive any funds as a result of the sale or resale of the Emerald Express' hull, the entire $445,137.50 represents the amount of the impairment of the Bank's title as a result of insured-against necessaries liens and thus the total amount of the Bank's insured loss.

43. For the record, the Court notes that it considered all available relevant evidence as to the value of the Bank's Shuttles mortgage in reaching this conclusion. *See First Am. Bank*, 585 F.3d at 838; *Volunteer State Life*, 143 So. at 44.

44. The Court did not consider Mr. Dufour's appraisal of the Emerald Express' hull for the same reason it did not consider Mr. Dufour's appraisal of the Ocean Jewel; those appraisals simply are not relevant because they were done too far in advance of either sale and under significantly different circumstances.

45. Moreover, the Court rejects the Bank's contention that it suffered an insured loss on its Shuttles mortgage in connection with those components of the Emerald Express that were removed from the vessel well in advance of the August 2007 foreclosure sale and which no party expressed any intention of re-installing on the vessel.

46. The district court in *Stewart & Stevenson Services, Inc. v. M/V CHRIS WAY MACMILLAN*, 890 F. Supp. 552 (N.D. Miss. 1995), stated governing principles relevant to this case: (1) "components of a vessel, even though readily removable, which are essential either for her general navigation or for the specific voyage upon which she is embarked become a part of the vessel itself and thus constitute appurtenances or apparel of the vessel"; (2) "an item of equipment need not be aboard the vessel in order to be an appurtenance of the vessel"; and (3) the determination of whether equipment that has been removed from a vessel remains an appurtenance depends upon the

44

intention of the parties. *Id.* at 561-64.

47.     The evidence in this case clearly demonstrates the Emerald Express' gearboxes, engines, and jet drives had been removed from the vessel well before the vessel was sold in 2007; indeed, the evidence shows the component parts were removed even before Titan filed for bankruptcy in 2005.  Furthermore, while the Court recognizes that equipment need not be physically onboard a vessel to be considered an appurtenance, there was no evidence whatsoever presented at trial that either party had any intention of re-installing those parts on the vessel at any time, even when the hull was resold in August 2009.

48.     Accordingly, the Court agrees with FATTIC that by the time the vessel was sold in 2007, the parts were no longer considered appurtenances of the Emerald Express, and thus those parts were not subject to the Bank's mortgage.  FATTIC owes no obligation to the Bank for losses suffered by the Bank unrelated to the insured mortgage.

49.     Because it paid in full the amounts owed to the Bank to reimburse the Bank's insured losses in connection with the Emerald Express mortgage,[161] FATTIC did everything it was required to do and paid everything it was required to pay under the terms of the Shuttles Policy with respect to the Emerald Express.  FATTIC owes nothing to the Bank in connection with the Emerald Express.

### 3.     Sapphire Express

50.     With respect to the Sapphire Express, the Court finds the Sapphire Express' February 2007 resale price is more probative of the vessel's true value at the time of judicial sale

---

[161] As explained earlier, FATTIC overpaid by approximately $5,000 in connection with the Bank's Emerald Express claim.  This discrepancy does not affect the Court's holding in any way.

than the price for which it was sold to Tampa Bay Shipbuilding by credit bid in October 2006.

51.  As a result, the Court finds the true value of the vessel on October 11, 2006 was $500,000.[162]

52.  The Court notes for the record that it considered all available relevant evidence as to the value of the Bank's Shuttles mortgage on the date the Sapphire Express was sold by judicial sale in reaching this conclusion. *See First Am. Bank*, 585 F.3d at 838; *Volunteer State Life*, 143 So. at 44.  The Court does not consider Mr. Conroy's or Dufour's appraisals to be relevant because they were done too far in advance of the sale and under different circumstances.[163]

53.  The Court also finds, after considering all available information relative to the difference in the value of the Bank's mortgage as insured and as encumbered on October 11, 2006, the value of the Bank's mortgage as insured was $411,288.  Because the Bank did not receive any funds as a result of the sale or resale of the Sapphire

---

[162] The Court does not finds persuasive the distinction FATTIC is attempting to draw between the sale of the two shuttles; that is, that the Emerald Express' resale price is relevant but the Sapphire Express' resale price is not.  Because both vessels were re-sold for substantially more than they fetched at their respective Marshal's sales, it appears, after considering the totality of the circumstances and all relevant information as to the vessels' values on their foreclosure sale dates, that the judicial sale prices were artificially low.

[163] In addition to the October 2006 judicial sale price, other potential indications of the vessel's value as of that date were: (1) Mr. Conroy's appraisal the vessel's value as of March 2004 at $2.2 million, *see* R. Doc. 134 at ¶ 20.; (2) Mr. Dufour's appraisal of the vessel's value as of August 2005 at $2 million, *see* Trial Exhibit 103; (3) the fact that in January 2006, after the vessel sank at its moorings, Yamashiro, apparently of the mind that the vessel in its pre-sinking condition was worth $500,000, agreed to remove the vessel from Yamashiro's purchase of the Ocean Jewel from Titan's estate in exchange for a $500,000 reduction in the total purchase price, *see* Trial Exhibit 178; (4) the fact that in March 2006, Mr. Keller informed Mr. Hull that someone had offered to buy the vessel in its post-sinking condition for $100,000, and that the potential buyer might be willing to go up to $200,000, *see* Trial Exhibit 215; and (5) Mr. Keller's testimony at trial that the vessel would not have fetched more than $200,000 if it were to be sold in a bankruptcy proceeding.  October 23 Trans. at 76:2 - 77:2.

Express, this amount represents the impairment of the Bank's title as a result of insured-against necessaries liens and thus the total amount of the Bank's insured loss.

54.     As explained earlier, $88,712 of Tampa Bay Shipbuilding's $99,227.38 credit bid was designated as superpriority claims by the bankruptcy court.

55.     Section 2(d) of the Shuttles Policy expressly excludes from coverage "[d]efects, liens, [and] encumbrances . . . attaching or created subsequent" to the Shuttles Policy's effective date.[164]  Section 2(d) also states this exclusion does not limit the coverage provided under Covered Risk 14.[165]  Covered Risk 14, as modified by Endorsement No. 1, provides that FATTIC insures reimbursement for loss of priority due to "any statutory lien for Necessaries (as that term is defined in 46 U.S.C. § 31301 or its equivalent under the law of Panama),"[166] regardless of whether the lien arises prior to or after the Shuttles Policy's effective date.[167]

56.     Because the superpriority claims were created by the court, not by statute, and because they arose after the effective date of the Shuttles Policy, they are excluded from coverage.  Mr. Hull correctly determined FATTIC did not owe the Bank anything in connection with the $88,712 worth of superpriority claims asserted by Tampa Bay Shipbuilding against the Sapphire Express.

57.     After subtracting out the $88,712 in superpriority claims asserted by Tampa Bay Shipbuilding from the $500,000 price for which the Sapphire Express resold in

---

[164] Trial Exhibit 72 at p. 2.

[165] *Id.*

[166] Under 46 U.S.C. § 31301(4), "necessaries" is defined as "repairs, supplies, towage, and the use of a dry dock or marine railway."

[167] *See* R. Doc. 134 at ¶ 14.

February 2007, $411,288 is the amount by which the Bank's mortgage was impaired as a result of necessaries liens asserted against the vessel. To date, FATTIC has paid only $10,515.38 of this amount.

58. Because it paid less than the full amount owed to the Bank to reimburse the Bank's insured losses in connection with the Sapphire Express mortgage, FATTIC did not do everything it was required to do, and did not pay everything it was required to pay, under the terms of the Shuttles Policy with respect to the Sapphire Express. Pursuant to the Shuttles Policy, FATTIC still owes the Bank $400,772.62 in connection with the Sapphire Express.

## V.   FATTIC is Not Liable to the Bank for Vessel Preservation Costs or Professional Services Fees

59. In addition to its claim that FATTIC has yet to reimburse the Bank $7,884,893.20 in insured losses in connection with the Ocean Jewel and Shuttles mortgages, the Bank also seeks $3,482,383 in "vessel preservation" costs and $786,710 in costs expended by the Bank "to preserve the lien of its mortgage under the title policies."[168] The Bank argues these expenses are recoverable under Section 8(d) of the policies, which the Bank contends creates an obligation on the part of FATTIC to reimburse the Bank two kinds of indebtedness created after the issuance of the policies: (1) "advances made to protect the lien of the mortgage"; and (2) "reasonable amounts expended to prevent

---

[168] *See* R. Doc. 154 at p. 44-46. While FATTIC does not agree that it is obligated to reimburse the Bank for these costs under the terms of the policies, FATTIC does not dispute the fact that the Bank incurred these costs, *see* R. Doc. 134 at ¶¶ 25-31, nor does FATTIC dispute the specific amounts of the expenses. FATTIC experts Fred Caruso and George Panzeca testified at trial that the Bank did, in fact, incur costs in the amounts listed above. *See* Trial Exhibits P-318-1, P-318-2, P-318-3, and P-318-4 (spreadsheets containing Mr. Caruso's analyses of the costs incurred by the Bank); Trial Exhibit P-320-8 (Mr. Panzeca's summary of professional fee expenses incurred by the Bank).

deterioration of the vessels."[169]  The Bank contends this section, when read in the context of the policies as a whole, provides that FATTIC insures reimbursement of post-policy expenses incurred by the Bank in defending against the defects in its titles created by the necessaries liens.[170]

60.    FATTIC argues Section 8(d) is not actually an insuring clause, but instead a provision limiting the amount for which FATTIC can be held responsible under the policies under the applicable Section 7 differential calculation.    FATTIC reads Section 8(d) as increasing FATTIC's limit of liability under certain circumstances, but that such an increase does not come into play unless the Bank is able to show that it suffered an actual loss or damage as a result of a covered risk.  According to FATTIC, Section 8(d) does not add any more covered risks to the Policy and, because neither the Bank's preservation expenses nor its professional fees were incurred as a result of an enumerated covered risk, the Bank is not entitled to reimbursement for those costs and expenses.

61.    As the Fifth Circuit noted in its opinion in this case, well-settled Louisiana law requires the provisions in the FATTIC policies "be interpreted in light of the other provisions so that each is given the meaning suggested by the contract[s] as a whole."  *First Am. Bank*, 585 F.3d at 837.  In addition, the Fifth Circuit stated, as with any insurance

---

[169] *See* Trial Exhibit 45; Trial Exhibit 72.

[170] The specific "preservation cost" expenses for which the Bank seeks reimbursement were all incurred between the date Titan filed for bankruptcy and the date the Ocean Jewel was sold in February 2006.  The Bank argues the expenses incurred (e.g., DIP financing, Titan overhead costs, vessel maintenance and crew costs, etc.) were necessary to "preserve" the vessel (i.e., prevent it from deteriorating) in an attempt to maintain the vessel's value until it could be sold.  The specific "professional fee" expenses for which the Bank seeks reimbursement all relate to legal representation and other professional services sought by the Bank in connection with Titan's bankruptcy and the Bank's efforts to maintain Titan as a going concern and to maintain the value of Titan's vessels.

policy, the FATTIC policies "should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict [their] provisions beyond what is reasonably contemplated by [their] terms or so as to achieve an absurd conclusion." *Id.*

62.   The Court agrees with FATTIC on this issue.  Section 8(d) does not obligate FATTIC to reimburse the Bank for the more than $4 million in preservation costs and attorney's fees the Bank incurred between the date Titan filed for bankruptcy and the dates the vessels were sold.[171]

63.   These expenses were not incurred as a result of the necessaries liens.  The expenses incurred by the Bank as a part of its efforts to keep the Titan gambling operation afloat, and to maximize the value of its collateral, are not losses or damage due to insured defects in the Bank's title.

64.   Instead, those expenses were incurred by the Bank due to Titan's abysmal business performance, which led to a rapid decline in the value of the vessels and their eventual sale at substantially reduced prices.[172]

65.   The mere existence of necessaries liens asserted against the vessels was not the cause of Titan's downfall, nor were those liens the reason the Bank decided to incur the costs

---

[171] Prior to trial, the parties stipulated to the amount of the Bank's professional fees and preservation costs.  *See* R. Doc. 134 at ¶¶ 25-31.

[172] *See, e.g.,* Hagen Dep., Vol. III, 37:9 - 46:4, Sept. 11, 2007 (explaining the Bank's decision to provide DIP financing for a period of time after Titan's bankruptcy); October 23 Trans. at 237:4-19, 240:4-16 (trial testimony of David Caruso, explaining that the Bank's decision to provide DIP financing, and its decision to stop providing that financing, was unrelated to necessaries liens); October 22 Trans. at 103:7 - 18 (trial testimony of Robert Hull, explaining FATTIC's reasons for not paying the Bank its professional fee and preservation cost expenses); October 24 Trans. at 73:1 - 80:7, 90:2 - 91:22 (trial testimony of George Panzeca, in which Mr. Panzeca concedes he does not know whether the Bank's professional fees and preservation costs were incurred as a result of an insured risk); October 23 Trans. at 118:18 - 157:18 (trial testimony John Keller, in which Mr. Keller concedes the Bank's professional fees and preservation costs were not incurred as a result of the necessaries liens, just that they were incurred at around the same time those necessaries liens were being resolved).

and expenses for which it now seeks reimbursement.  Section 8(d) does not expand FATTIC's liability to the Bank to include all preservation and holding expenses.  It serves only to set a limitation on FATTIC's aggregate liability to the Bank in the event such expenses are incurred as a result of a covered risk.  Because the evidence at trial clearly shows FATTIC's expenses were not incurred as a result of insured necessaries liens, Section 8(d) does not apply.

66.     As a result, the Bank is not entitled to recover anything from FATTIC pursuant to Section 8(d) in connection with the professional fees and preservation expenses it incurred relative to the Ocean Jewel, the Emerald Express, and the Sapphire Express.

## VI.     FATTIC's Handling of the Bank's Claims was Not in Bad Faith

67.     Finally, the Court turns to the Bank's claims that FATTIC acted in bad faith and breached its duties as an insurer, thus rendering FATTIC liable to the Bank for various penalties pursuant to Louisiana Revised Statute 22:1892[173] and Louisiana Revised

---

[173] Section 22:1892 reads in relevant part:

    A.    (1)    All insurers . . . shall pay the amount on any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. . .

    ***

    B.    (1)    Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor  . . . when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs.

LA. REV. STAT. ANN. § 22:1892(A)(1), (B)(1).

Statute 22:1973.[174]

68.  In *Levy Gardens*, the Fifth Circuit explained the elements of a bad faith claim asserted

under these two statutes as follows:

> A cause of action for penalties . . . requires a showing that (1) an
> insurer has received satisfactory proof of loss, (2) the insurer fails
> to tender payment within thirty days of receipt thereof, and (3)
> the insurer's failure to pay is arbitrary, capricious or without

---

[174] 22:1973 reads as follows:

A.  An insurer . . . owes to his insured a duty of good faith and fair
dealing. The insurer has an affirmative duty to adjust claims fairly
and promptly and to make a reasonable effort to settle claims with
the insured or the claimant, or both. Any insurer who breaches
these duties shall be liable for any damages sustained as a result of
the breach.

B.  Any one of the following acts, if knowingly committed or performed
by an insurer, constitutes a breach of the insurer's duties imposed
in Subsection A of this Section:

(1)  Misrepresenting pertinent facts or insurance
policy provisions relating to any coverages at issue.

(2)  Failing to pay a settlement within thirty days after
an agreement is reduced to writing.

(3)  Denying coverage or attempting to settle a claim
on the basis of an application which the insurer
knows was altered without notice to, or knowledge
or consent of, the insured.

(4)  Misleading a claimant as to the applicable
prescriptive period.

(5)  Failing to pay the amount of any claim due any
person insured by the contract within sixty days
after receipt of satisfactory proof of loss from the
claimant when such failure is arbitrary, capricious,
or without probable cause.

(6)  Failing to pay claims pursuant to R.S. 22:1893
when such failure is arbitrary, capricious, or
without probable cause.

C.  In addition to any general or special damages to which a claimant
is entitled for breach of the imposed duty, the claimant may be
awarded penalties assessed against the insurer in an amount not to
exceed two times the damages sustained or five thousand dollars,
whichever is greater.

LA. REV. STAT. ANN. § 22:1973(A) - (C).

probable cause." *Louisiana Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1112–13 (La. 2008). "The phrase 'arbitrary, capricious, or without probable cause' ... describe[s] an insurer whose willful refusal of a claim is not based on a good-faith defense." *Id.* at 1114. Under Louisiana law, "penalties should be imposed only when the facts negate probable cause for nonpayment," not "when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." *Id.* (quotation marks and citation omitted). "[W]hen there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause." *Id.* On the other hand, "an insurer cannot stonewall an insured simply because the insured is unable to prove the exact extent of his damages. Where the exact extent of the damages is unclear, an insurer must tender the reasonable amount which is due." *Id.* at 1115 (quotation marks and citation omitted). In *Louisiana Bag*, the Louisiana Supreme Court found the trial court committed manifest error when it did not impose penalties where the insurer did not dispute that it received proof of loss and delayed making payment on the undisputed portion of the claim to the insured. *Id.* at 1114–15, 1122.

*Levy Gardens*, 706 F.3d at 634-35.  "Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action. . . . Because the question is essentially a factual issue, the trial court's finding should not be disturbed on appeal absent manifest error." *Id.* at 635 (quoting *Reed v. State Farm Mut. Auto. Ins. Co.*, 03-107 ;(La. 10/21/03); 857 So.2d 1012, 1021). Because penalty statutes such as these are penal in nature, they are strictly construed. *See, e.g., Guillory v. Lee*, 09-75 (La. 6/26/09); 16 So.3d 1104, 1130.

69.     Because the Court has found FATTIC fulfilled most of its obligations under the policies to the Bank, and that it did so in as timely a fashion as could be expected in a case as complex as this, the Court finds there is no factual basis for the Bank's claims for penalties under either of the Louisiana insurance penalty statutes.

70.   FATTIC timely adjusted the Bank's Ocean Jewel claim and, once the final amount due to the Bank became clear, FATTIC paid that amount in a timely fashion.

71.   With respect to the Shuttles, FATTIC's initial assertion that it owed nothing to the Bank in connection with either vessel, while ultimately incorrect, was not unreasonable, arbitrary, or capricious. *Levy Gardens*, 706 F.3d at 635; *see also Rainbow USA, Inc. v. Nutmeg Ins. Co.*, 612 F. Supp. 2d 716, 732 (E.D. La. 2009) (under Louisiana law, "[a]n insurer that has a reasonable basis for denying coverage or reasonable doubts as to whether coverage applies does not act in bad faith; indeed, such an insurer 'has the right to litigate . . . questionable claims without being subjected to damages and penalties.'") (quoting *Clark v. McNabb*, 04-5 (La. App. 3 Cir. 5/19/04); 878 So.2d 677, 684).

72.   Indeed, once it became clear that the Bank did, in fact, suffer an insured loss in connection with Emerald Express, FATTIC timely tendered a check to the Bank covering that insured loss in its entirety.

73.   While FATTIC's conduct with respect to the Bank's Sapphire Express claim presents a bit of a closer call, the Court nevertheless finds FATTIC's conduct did not rise to the level of being arbitrary and capricious. FATTIC had a reasonable basis to defend against the Bank's claim, and it acted in good faith reliance on that defense when it decided to deny the claim and litigate this case. *Rainbow*, 612 F. Supp. 2d at 732.

74.   As in *Levy Gardens*, "[n]either party acted perfectly," but the Court finds FATTIC undertook its obligations as title insurer in good faith, and thus it should not be penalized for taking the time to make sure any losses suffered by the Bank were actually covered by the Ocean Jewel or Shuttles Policies before tendering any payments

to the Bank. *Levy Gardens*, 706 F.3d at 636.

75.  FATTIC is not liable to the Bank for penalties, attorney's fees, costs, or any other statutory damages or penalty authorized under Louisiana law for bad faith handling of an insurance claim.

## CONCLUSION

In light of the forgoing findings of fact and conclusions of law, **IT IS ORDERED** that the Bank shall submit a proposed judgment for the Court's consideration no later than **August 8, 2013,** at **5:00 p.m.**

**IT IS FURTHER ORDERED** that FATTIC may respond to the Bank's proposed judgment, if necessary, no later than **August 9, 2013,** at **5:00 p.m.**

**New Orleans, Louisiana, this** <u>5th</u> **day of August, 2013.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**